UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 MAR 23  AM 11: 53

BY_____
DEPUTY CLERK

JUSTIN RUSSELL,                          )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )          Case No. 5:15-cv-126
                                         )
ANDREW PALLITO, CYNTHIA MASON,           )
RICHARD BILODEAU, and LISA               )
MENARD,                                  )
                                         )
        Defendants.                      )

**OPINION AND ORDER**
**(Docs. 30, 33, 41, 63)**

Plaintiff Justin Russell, an inmate of the Vermont Department of Corrections ("DOC"),

has brought this civil-rights lawsuit against four officials and employees of the DOC: Andrew

Pallito, the former Commissioner; Lisa Menard, the current Commissioner; Cynthia Mason, a

Correctional Officer; and Richard Bilodeau, a Correctional Facility Shift Supervisor.  Russell

alleges that Pallito violated his rights under the Free Exercise Clause of the First Amendment

when he instituted a policy that Muslim prisoners would be provided kosher meals rather than

halal meals.  Russell alleges that Menard has continued this policy during her time as

Commissioner.[1]  Russell asserts claims for damages against both Pallito and Menard in their

personal capacities, and for injunctive and declaratory relief against Menard in her official

capacity.  He also seeks class certification on these claims.

Currently ripe for decision are the following motions: Defendant Menard's Motion to

Dismiss (Doc. 30); Defendant Pallito's Motion for Judgment on the Pleadings (Doc. 33); and

---

[1] Russell's claims against Mason and Bilodeau—which concern distinct incidents relating
to Russell's attempts to obtain halal meals—are not presently at issue.

Russell's Motion to Certify Class Action (Doc. 41). The Report and Recommendation of the United States Magistrate Judge on these motions was filed on August 9, 2016. (Doc. 63.) Plaintiff's objections were filed on August 23, 2016. (Doc. 64.) Defendants did not file objections.

## Analysis

A district judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). The district judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405.

In evaluating both a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and a motion for judgment on the pleadings, under Rule 12(c), a court evaluates whether the complaint "'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

After careful review of the record, the Magistrate Judge's Report and Recommendation, and the objections, this court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's recommendations.

## I.    Personal Involvement

Russell first challenges the Magistrate Judge's recommendation to dismiss the individual damages claims against Pallito and Menard on the grounds that the complaint does not sufficiently allege their personal involvement in Russell's claim that the DOC instituted a policy of providing kosher, rather than halal, meals to Muslim prisoners. (Doc. 64 at 2–5.)

The court recites the following allegations relevant to Russell's claims against Pallito and Menard. The complaint alleges that Russell was first approved for a halal diet on September 30, 2014, when he was housed at Northwest State Correctional Facility ("NWSCF") in Swanton, Vermont. (Doc. 61 ¶ 12.) He was transferred to Northern State Correctional Facility ("NSCF") in Newport, Vermont, on October 7. (*Id.* ¶ 19.) In December, according to the complaint, "pursuant to a policy change approved and implemented by DOC Commissioner Andrew Pallito, halal-approved prisoners [at NSCF] began receiving prepackaged meals that were clearly labeled 'kosher.'" (*Id.* ¶ 13.) As a result, "Russell began to abstain from eating anything except fruits and vegetables . . . because he could not be sure that anything else was halal." (*Id.* ¶ 37.) He began to lose weight because he was not getting enough calories. (*Id.* ¶ 37.)

On January 5, 2015, Russell was transferred back to NWSCF, where "prisoners were still receiving halal meals," rather than kosher substitutes. (Doc. 61 ¶ 38.) Eating well, Russell gained the weight he had lost. (*Id.* ¶ 38.) Russell was released to community supervision on January 26, 2015, but "lost his housing" in early March and was returned to prison. (*Id.* ¶ 39.)

Russell was initially placed at NWSCF. (Doc. 61 ¶ 40.) When Russell was incarcerated there before, in January 2015, Muslim prisoners had received halal meals, but now they were "given prepackaged meals that were clearly labeled 'kosher.'" (*Id.*) Shortly thereafter, Russell was transferred back to NSCF, where "[h]e and other Muslim prisoners were given a pre-packaged kosher diet in place of halal." (*Id.* ¶ 41.) According to Russell, "[t]his practice, which was instituted at the direction of Defendant Pallito, has continued since Defendant Menard" became the Commissioner in summer 2015. (*Id.*)

The Magistrate Judge concluded that the complaint insufficiently alleged the personal involvement of either Pallito or Menard. (Doc. 63 at 23–25.) The Magistrate Judge found that

the "sole factual allegation" regarding Pallito—that the meal change in December 2014 was "pursuant to a policy change approved and implemented by" Pallito—"merely reflect[ed] a *respondeat superior* argument." (*Id.* at 23.) The rest of the allegations regarding Pallito were conclusory, and therefore also insufficient to allege Pallito's personal involvement. (*Id.* at 24.) With regard to Menard, the Magistrate Judge concluded that the complaint failed to allege that "any lawsuits or other grievances" alerted Menard to the policy in question, which is necessary to hold liable a supervisor who continues an unconstitutional policy but did not create or implement it. (*Id.* at 25.)

The court respectfully disagrees with the Magistrate Judge's conclusion that the complaint does not sufficiently allege Pallito's personal involvement. The complaint alleges that, at two different prisons run by the DOC, Russell and other Muslim prisoners stopped receiving halal meals and instead received kosher meals. Thus the complaint alleges that the asserted unconstitutional conduct is the result of a policy in place across multiple Vermont prisons. While it is true that the complaint lacks specific allegations regarding *when* or *how* Pallito implemented this policy, these are unnecessary to allege his personal involvement in this case.

A complaint can allege facts "upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted) (citing *Iqbal*, 556 U.S. at 678 and *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). Determining the plausibility of a claim is a "'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Lundy v. Catholic Health Sys. of Long Island Inc.*,

4

711 F.3d 106, 114 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).  Here, it is a reasonable

inference that a policy that changed the food served to Muslim prisoners at multiple prisons

within the DOC was either created or implemented by the DOC Commissioner.  These are the

kinds of policy decisions that one expects might fall within his or her purview.  This is not an

attempt to conjure a custom or policy out of a single instance of alleged unconstitutional conduct

and then conclusorily attribute it to a supervisory defendant.  *Cf. Jones v. Town of East Haven*,

691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts of excessive force by non-policymaking

municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or

usage that would justify municipal liability."); *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163,

172–73 (D. Conn. 2003) (granting summary judgment to police chief on plaintiff's excessive

force claim where plaintiff "presented no evidence" that police chief had "initiated a policy or

custom requiring or permitting the use of excessive force" and no evidence of "other incidents

similar . . . to suggest that the alleged use of undue force was a standard practice").  Accordingly,

the complaint satisfactorily alleges the personal involvement of Pallito under the third means of

establishing supervisory liability under *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995): a

supervisor is liable if he "created a policy or custom under which unconstitutional practices

occurred, or allowed the continuance of that policy or custom."[2]

      Pallito argues in his motion for judgment on the pleadings that, under DOC policy, he is

not responsible for determinations regarding "food service operations" and "menu formulation,"

and that those decisions are instead made by the Director of Administrative Services, prison

---

[2] The Second Circuit has noted that *Iqbal* might affect the "continuing vitality of the
supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir.
2012), but the court has not yet addressed the question.  *See also Grullon v. City of New Haven*,
720 F.3d 133, 139 (2d Cir. 2013).  Accordingly, the court will apply the *Colon* supervisory
liability test until the Second Circuit holds otherwise.  *See McLennon v. City of N.Y.*,
171 F. Supp. 3d 69, 101 n.10 (E.D.N.Y. 2016).

superintendents, and other food-service staff.  (Doc. 33 at 17; Doc. 33-1 at 2 (DOC

Directive 354.01); Doc. 33-1 at 7 (DOC Directive 354.02).)  But at the same time, Pallito

acknowledges that he "provided general guidance regarding the [DOC's] food service options."

(Doc. 33 at 17.)

It may be that the evidence proves Pallito's version of the facts, and shows that he had

nothing to do with the decision to give kosher meals to Muslim prisoners.  But in evaluating

Pallito's motion for judgment on the pleadings (evaluated under the same standard as a motion to

dismiss, *see Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010)), the court must accept

the factual allegations in the complaint as true and draw all reasonable inferences therefrom.

"Plausibility" is not a measure of "probability." *Iqbal*, 556 U.S. at 678. Said another way, the

allegations "need not be more likely than other possibilities." *Loreley Financing (Jersey) No. 3*

*Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007)).  The court cannot conclude at this stage of the proceedings

that it is implausible that Pallito played a role in this alleged change of policy, especially on such

a sensitive issue as religious requirements and dietary restrictions.

Russell also contends that the Magistrate Judge wrongly concluded that Menard, who

became DOC Commissioner in September 2015, had no personal involvement in the alleged

violations.  (Doc. 64 at 4–5.)  He argues that Menard had notice of the "ongoing unconstitutional

harms when she assumed office," because "this very lawsuit was then underway," and that in any

event, she was brought in as a defendant in the first amended complaint in December 2015.

(Doc. 64 at 4; Doc. 21.)  Defendants respond that the complaint "alleged no facts plausibly

demonstrating that Menard knew or learned about the policy or practice in issue or this lawsuit

6

through grievance appeals, letters, other complaints, reports or meetings and decided to allow it to continue." (Doc. 67 at 8–9.)

A supervisory defendant may be held liable, not only for creating a policy, but also for allowing it to continue after learning of it. *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health of State of N.Y.*, 189 F.3d 273, 278 (2d Cir. 1999); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *Doe v. New York*, 97 F. Supp. 3d 5, 11 (E.D.N.Y. 2015). The complaint alleges that Menard is the current DOC Commissioner and names her as a defendant. (Doc. 61 ¶ 4.) It alleges that the policy of serving kosher meals to Muslim prisoners has continued since Menard became Commissioner in 2015. (*Id.* ¶ 41.) Thus, the complaint alleges that Menard learned of the policy—when she was named as a Defendant and served with the complaint—and that she has allowed the policy to continue. To the extent Russell seeks damages for kosher meals instead of halal meals served to him *after* Menard became Commissioner and *after* she learned of the policy, Menard may be liable.

Accordingly, the court rejects the Magistrate Judge's recommendation to grant Defendants' motions on the basis of personal involvement and dismiss Russell's claims against Defendants in their personal capacities for money damages. Instead, the court denies the motions on those grounds.

## II.  Compensable Injury

The Magistrate Judge also concluded that, even if the complaint alleged the personal involvement of Pallito and Menard, the complaint nonetheless failed to allege a compensable injury resulting from "his and the proposed class members' First Amendment right to the free exercise of religion." (Doc. 63 at 37.)

The court respectfully disagrees with that conclusion. The court begins with the Prison Litigation Reform Act (the "PLRA"). The PLRA limits the types of injuries for which a prisoner may recover in a federal civil lawsuit:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e). As the Magistrate Judge noted, the Second Circuit has interpreted this provision as a "limitation on recovery of damages." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002). The provision bars recovery "for mental and emotional injury in the absence of a showing of physical injury," but "it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Id.*; *see also Toliver v. City of N.Y.*, 530 F. App'x 90, 93 n.2 (2d Cir. 2013).

The Magistrate Judge reasoned that, since Russell was not seeking compensation for mental or emotional injuries, this provision did not bar his claim for compensatory damages. (Doc. 63 at 36–37.) But the Magistrate Judge nonetheless concluded that the complaint did not otherwise allege a "compensable injury." (*Id.*)

Russell disagrees with this conclusion. He argues that the denial of an opportunity to freely exercise his religious beliefs *is itself* a compensable injury, and that such an injury is not a "mental or emotional injury"—recovery for which would be barred under § 1997e(e) absent physical injury. (Doc. 64 at 6–8.)

Defendants respond that the violation of one's constitutional rights is not an injury itself, and that the Supreme Court in *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986), and *Carey v. Piphus*, 435 U.S. 247 (1978), made clear that compensatory damages are recoverable only for "actual injury," as opposed to injury based on the "abstract value" of a

8

constitutional right.  (Doc. 67 at 10–12.)  Any "actual injury" Russell may have suffered,

Defendants contend, must be either mental or emotional, and therefore recovery would be barred

under § 1997e(e).  (Doc. 67 at 11.)

The court begins by reviewing the Supreme Court cases in question.  In *Carey*, the

Supreme Court considered whether, in an action under § 1983 for "deprivation of procedural due

process, a plaintiff must prove that he actually was injured by the deprivation before he may

recover substantial 'nonpunitive' damages."  435 U.S. at 253.  The Court concluded that,

because § 1983 was intended to "create a species of tort liability," a plaintiff could only obtain

compensation "for injuries caused by the deprivation of constitutional rights," not merely for the

deprivation of rights itself.  *Id.* at 253–54 (internal quotation marks and alterations omitted).

Where the "interests protected by a particular constitutional right" parallel "the interests

protected by a particular branch of the common law of torts," courts could directly apply "the

tort rules of damages."  *Id.* at 258.  But, the Court cautioned, a court could not rely on tort rules

exclusively, because some constitutional rights might protect interests that lack an analog in tort

law.  *Id.* at 258.  Instead, "the rules governing compensation for injuries caused by the

deprivation of constitutional rights should be tailored to the interests protected by the particular

right in question."  *Id.* at 259.  As the Court emphasized, "the elements and prerequisites for

recovery of damages appropriate to compensate injuries caused by the deprivation of one

constitutional right are not necessarily appropriate to compensate injuries caused by the

deprivation of another."  *Id.* at 264–65.

With regard to the constitutional right at issue in that case, the right to procedural due

process, the Court explained that the right was intended to protect against the "mistaken or

unjustified deprivation of life, liberty or property," not merely to protect against insufficient

process. *Id.* at 259. Thus, a plaintiff could not seek compensatory damages for constitutionally deficient process unless that deficiency caused injury, either in the form of an unjustified deprivation of life, liberty, or property, or, perhaps in the form of mental or emotional distress. *Id.* at 260, 263–64.

In *Stachura*, the Court reviewed an award of damages to a teacher who had claimed that his suspension from teaching had deprived him of liberty and property without due process and violated his First Amendment right to academic freedom. 477 U.S. at 301–03. The district court had instructed the jury to consider three distinct categories of damages: (1) compensatory damages based on "lost earnings; loss of earning capacity; out-of-pocket expenses; and any mental anguish or emotional distress"; (2) punitive damages; and (3) damages for the deprivation of the constitutional rights themselves. *Id.* at 302. In considering this last category, the district court told the jurors that "[t]he precise value you place upon any Constitutional right . . . is within your discretion," and that they could "consider the importance of the right in our system of government, the role which this right has played in the history of our republic, [and] the significance of the right in the context" of the plaintiff's activities. *Id.* at 303.

These instructions on the third aspect of damages, the Supreme Court concluded, "cannot be squared with *Carey*" because they focused, "not on compensation for provable injury, but on the jury's subjective perception of the importance of constitutional rights as an abstract matter." *Id.* at 308. "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Id.* at 308. Instead, "such damages must always be designed 'to *compensate injuries* caused by the [constitutional] deprivation.'" *Id.* at 309 (quoting *Carey*, 435 U.S. at 265). The Court also rejected the argument that the jury instructions were a form of "presumed damages." *Id.* at 310–12. Presumed damages are appropriate compensatory damages where a plaintiff

suffered a harm that is "impossible to measure." *Id.* at 311. Since the jury instructions focused

on abstract questions regarding a constitutional right's abstract value, rather than on any concrete

injury the plaintiff actually suffered, they were not an instruction on presumed damages. *Id.*

at 310–12.

But these cases do not stand for the principle for which Defendants advocate—that a

deprivation of a constitutional right can itself *never* be an actual and compensable injury. *Carey*

itself emphasized that, in determining compensable injury, each constitutional right had to be

approached differently. 435 U.S. at 264–65. And in a footnote in *Stachura*, the Court noted that

in some circumstances the deprivation of certain constitutional rights could alone constitute

compensable injury. 477 U.S. at 311 n.14. For instance, a plaintiff who had been "illegally

prevented from voting in a state primary election suffered compensable injury," because "the

plaintiff had suffered a particular injury—his inability to vote in a particular election—that might

be compensated through substantial money damages." *Id.* (discussing *Nixon v. Herndon*,

273 U.S. 536 (1927)). The appropriate money damages from being denied the right to vote were

based on the "money value of the particular loss that the plaintiff suffered—a loss of which 'each

member of the jury has personal knowledge,'" not on "the value of the right to vote as a general,

abstract matter." *Id.*

The Second Circuit's decision in *Thompson* is not to the contrary. In *Thompson*, the

court rejected the argument that § 1997e(e) categorically did not apply to claims of violations of

certain constitutional rights. 284 F.3d at 416–17. But it did not address what *kinds* of injuries

may be compensable in relation to certain constitutional rights. Hence its holding that

§ 1997e(e) "does not restrict a plaintiff's ability to recover compensatory damages for *actual

injury*." *Id.* at 416 (emphasis added).

Thus, the pivotal question is whether the complaint plausibly alleges an actual or compensable injury that is not a "mental or emotional injury" for which recovery is barred by § 1997e(e) absent a showing of physical injury. Or, stated more broadly, can the denial of one's right under the First Amendment to free exercise of religion be a compensable injury in itself?

The court concludes that the deprivation of this First Amendment right can be a compensable injury and that the complaint plausibly alleges such an injury. The Second Circuit has recognized that the denial of a specific opportunity to exercise one's First Amendment rights can itself be a compensable injury. *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (holding that denial of "particular opportunity" to exercise one's right to free speech "can give rise to a compensable injury"). And the Southern District of New York has concluded that "a First Amendment deprivation presents a cognizable injury standing alone," and that § 1997e(e) does not bar compensable damages for that injury. *Lipton v. Cty. of Orange*, 315 F. Supp. 2d 434, 457–58 (S.D.N.Y. 2004); *see also Ford v. McGinnis*, 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001).

Importantly, two other circuits recently have addressed this question and the corresponding question of whether prisoners may obtain compensatory damages for those injuries under the PLRA. In *King v. Zamiara*, 788 F.3d 207, 212 (6th Cir. 2015), the court concluded "that deprivations of First Amendment rights are themselves injuries, apart from any mental, emotional, or physical injury that might also arise from the deprivation." Relying on *Carey* and *Stachura*, the court explained that "courts have allowed plaintiffs to recover presumed damages for actual injuries caused by constitutional violations that are 'likely to have occurred' but difficult to measure, even when the injury claimed is neither physical harm nor mental or emotional distress." *Id.* at 214. The court affirmed the district court's award of compensatory

damages to King for prison officials' retaliation against him for participating in other litigation

and helping other prisoners file grievances. *Id.* at 211, 215. The court explained that the district

court had focused on the "specific, actual injuries," that King had suffered—"the negative impact

on his ability to obtain affidavits or declarations concerning prisoner property violations for use

in the [other] litigation"—rather than "the abstract value or importance of his First Amendment

rights." *Id.* at 215 (internal quotation marks omitted). And the court explained that § 1997e(e)

did not bar prisoners from receiving compensation for such injuries because, by its plain

language, the statute only barred recovery for "mental or emotional injury" without a showing of

physical injury, it did not address "constitutional injury." *Id.* at 212–13.

The D.C. Circuit expressed its agreement with this approach in *Aref v. Lynch*, 833 F.3d

242, 262–67 (D.C. Cir. 2016). It noted that "courts frequently allow plaintiffs in Section 1983

actions to recover damages for constitutional violations that fall outside the domain of common-

law injuries," and cited cases approving of compensatory damages for various "intangible

interests," including "the restriction of an inmate's access to books," the deprivation of "visiting,

phone, and library privileges," the imposition of solitary confinement, and the fabrication of

evidence. *Id.* at 264.

Here, Russell alleges a specific injury in line with other constitutional injuries that courts

have considered compensable. He alleges that DOC's policy of providing kosher meals to

Muslim prisoners denied him and the rest of the proposed class "a diet that conforms to the

requirements of their religion." (Doc. 61 ¶ 15.) The denial of a meal prepared in accordance

with one's religious beliefs is an actual, compensable injury.[3] *See Ford*, 198 F. Supp. 2d at 365–

---

[3] The Magistrate Judge concluded that the complaint adequately alleged a First
Amendment deprivation and that, at least under the allegations of the complaint, the policy of
providing Muslim prisoners with kosher meals might violate the inmates' First Amendment right

66. Although the harm caused by this injury is not easily quantified, it is nonetheless "a loss of which 'each member of the jury has personal knowledge,'" and for which presumed damages may be awarded. *See Stachura*, 477 U.S. at 311 n.14. The jury need not consider the "value of the right . . . as a general, abstract matter," to make this determination. *Id.*

Thus, the complaint states a claim for compensatory damages (and nominal damages)[4] against Defendants Pallito and Menard for the denial of religious meals. Of course, any actual recovery for compensatory damages that Russell obtains in this suit cannot contravene the dictates of § 1997e(e). He will be unable to recover for mental or emotional injury unless he can also show physical injury.

Accordingly, the court rejects the Magistrate Judge's recommendation and denies Defendants' motions to the extent they assert that Russell has not alleged a compensable injury.

## III.  Punitive Damages

The Magistrate Judge also granted Defendants' motion to dismiss any claim for punitive damages because the complaint failed to allege "any evil motive, conscious wrongdoing, or other condition of the mind of Pallito or Menard." (Doc. 63 at 38–39.)

Russell objects to this ruling, arguing that his complaint did not allege a claim for punitive damages and that the Magistrate Judge therefore prematurely dismissed any potential recovery for punitive damages. (Doc. 64 at 8–9.) The court agrees with Russell. The current

---

"to a diet consistent with [their] religious scruples.'" *Holland v. Goord*, 758 F.3d 215, 221 (2d Cir. 2014). (Doc. 63 at 26–35.) Defendants do not challenge this conclusion, nor does the court see any basis to question it.

[4] The Magistrate Judge does not address, and Defendants do not question, that Russell may obtain nominal damages in the event that the court or the jury finds Defendants violated his rights. A plaintiff may always obtain nominal damages on a claim for a deprivation of constitutional rights, even if there is no compensable injury of any kind. *Thompson*, 284 F.3d at 416 (2d Cir. 2002); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999); *Irish Lesbian & Gay Org.*, 143 F.3d at 651.

14

complaint does not include any request for punitive damages.  Absent amendment, the court will

not rule on whether the complaint alleges facts sufficient to support a request for punitive

damages.

Defendants argue that the court should not consider this argument because Russell did

not make it to the Magistrate Judge.  (Doc. 67 at 15.)  But it is a district court's responsibility to

"make a *de novo* determination of those portions of a magistrate judge's report and

recommendation to which an objection is made."  *Wells Fargo Bank, N.A. v. Sinnott*,

No. 2:07-CV-169, 2010 WL 297830, at *1 (D. Vt. Jan. 19, 2010).

Accordingly, the court rejects the Magistrate Judge's recommendation and denies

Defendants' motions with regard to the dismissal of a claim for punitive damages.

## IV.    Standing to Pursue Injunctive Relief, Class Certification, and Viability of Claim under Religious Land Use and Institutionalized Persons Act

Finally, the court addresses three related issues: Russell's standing to pursue injunctive

and declaratory relief against Menard, the current DOC Commissioner, his Motion to Certify

Class Action, and his claim under the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5.

In her Motion to Dismiss, filed on January 25, 2016, Menard argued that Russell's claim

for injunctive and declaratory relief against her were moot because he had been released from the

DOC's custody in November 2015.  (Doc. 30 at 7.)  She also contended that, because Russell's

claims were moot, he could no longer serve as class representative for a claim seeking to obtain

injunctive or declaratory relief.  (Doc. 30 at 9–11.)  By the time Russell responded to the motion,

on February 26, 2016, he had been reincarcerated.  (Doc. 38 at 3.)  The Magistrate Judge ordered

additional briefing on the question of mootness and class certification.  (Doc. 47 at 2–4.)

Menard responded that, with Russell back in DOC custody, the Magistrate Judge should not rule

on her mootness argument. (Doc. 52 at 5–7.) Accordingly, while the Magistrate Judge concluded that Russell had standing generally to pursue his claims, (Doc. 63 at 15–20), the Magistrate Judge did not address whether Russell's claim for injunctive and declaratory relief were moot because he had been returned to DOC custody.

In challenging the Magistrate Judge's recommendation to deny without prejudice his motion for class certification, Russell stated on August 23, 2016, that he was currently on parole. (Doc. 64 at 9.) But according to his complaint, Russell ceased being under the supervision of the DOC in November 2016. (Doc. 61 ¶ 1.) That statement is confirmed by the court's search of the DOC's Offender Locator, http://doc.vermont.gov/offender-locator/ (follow link to offender locator, search by Plaintiff's name) (last visited February 24, 2017), which returned no results for Russell. Accordingly, the court must consider whether Russell's claims for injunctive and declaratory relief are now moot. *See Muhammad v. City of N.Y. Dep't of Corr.*, 126 F.3d 119, 122 (2d Cir. 1997) (noting that a court "must examine the issue [of mootness] sua sponte when it emerges from the record" (internal quotation marks omitted)).

Claims for injunctive and declaratory relief against prison officials are mooted by an inmate's transfer or release from the prison in question. *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). But there is "an exception to the mootness doctrine for circumstances which are 'capable of repetition, yet evading review.'" *Muhammad*, 126 F.3d at 123. For individual plaintiffs, this exception applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Van Wie v. Pataki*, 267 F.3d 109, 113–14 (2d Cir. 2001) (internal quotation marks and alterations omitted). Nothing here suggests that the challenged action—DOC's current policy of providing kosher meals to

Muslim prisoners—is "too short" in its duration to be fully litigated. Indeed, nothing suggests that the policy is time limited at all.

A similar exception applies in the class action context. Generally, in class actions, "if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot," while class certification prior to a claim becoming moot "will preserve an otherwise moot claim." *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994). A narrow exception to this doctrine exists for "inherently transitory" claims where the named plaintiff's claims become moot prior to class certification. *Id.* at 799. In those circumstances class certification is said to "relate back" to the time of the complaint's filing to prevent mootness. *Id.* To invoke this doctrine, a plaintiff must show that "'(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint.'" *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016) (quoting *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010)). The Supreme Court has applied this exception in limited circumstances—for instance, where a class of pretrial detainees alleged that they were being held for trial without a probable cause hearing, *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975), or where a class of persons arrested without a warrant might have to wait as much as seven days before a probable cause determination, *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991).

But nothing in the record suggests that Russell's claim for injunctive relief is "so inherently transitory," that any given Muslim prisoner, named as plaintiff, could not bring this claim and have it certified before his personal interest became moot. *See Gerstein*, 420 U.S. at 110 n.11. Prisoners often face multi-year sentences, and their claims regarding prison-wide

policies that ostensibly violate their rights are frequently litigated to resolution.  Nor has Russell

put forth any evidence that either the class of prisoners he seeks to represent (Muslim prisoners

who receive kosher rather than halal meals) or the claim he presses (that such meals violate the

prisoners' First Amendment rights) make it "uncertain that a claim will remain live for any

individual who could be named as a plaintiff long enough for a court to certify the class."  In

evaluating whether claims brought by prisoners are "inherently transitory," courts have looked to

whether unique aspects of either the proposed class or the claims support that conclusion.

*See Amador v. Andrews*, 655 F.3d 89, 101 (2d Cir. 2011) (applying "inherently transitory"

exception to mootness doctrine for class of female prisoners challenging policies and procedures

relating to sexual abuse and assault, noting that only "a small fraction of the total inmates" were

actually subjected to misconduct, that "the odds of an inmate being able to complete the

grievance procedure and litigate a class action while still incarcerated were rather small," and

that only 4 of 13 named plaintiffs were still in custody when district court issued a dispositive

decision); *Zurak v. Regan*, 550 F.2d 86, 89–92 (2d Cir. 1977) (applying the exception to a class

of prisoners defined as those serving certain kinds of sentences that were at most two years);

*Olson*, 594 F.3d at 579, 582–84 (applying exception to class of county jail inmates where

average stay in jail was 139 days and where length of stay for any individual inmate was at

discretion of state department of corrections).

In earlier briefing, Russell argued that, even if his motion for class certification were filed

*after* his personal claims became moot, class certification could still relate back to the filing of

the complaint.  (Doc. 38 at 4–5.)  But the cases Russell cites do not address "inherently

transitory" claims; they address circumstances in which a defendant in a putative class action

attempts to "pick off" the representative plaintiff with an offer of complete relief before he has a

chance to move for class certification.[5]  This is an entirely different justification for relating class

certification back to the complaint and is inapplicable here.

The court concludes that Russell lacks standing to seek injunctive or declaratory relief on

his claim because he is no longer in custody of the DOC.[6]  The court also concludes that Russell

has not demonstrated that the claims he seeks to pursue are so "inherently transitory," as would

permit him nonetheless to serve as a representative plaintiff in a class action on those claims.

Because Russell can no longer pursue his claims for injunctive or declaratory relief, his objection

to the Magistrate Judge's recommendation on this ground is unavailing.  The court therefore

adopts the Magistrate Judge's recommendation to deny without prejudice Russell's Motion to

Certify Class Action.

Because Russell lacks standing to seek injunctive relief, his claim against Menard under

RLUIPA must be dismissed.  RLUIPA provides prospective relief only; it does not waive states'

sovereign immunity to suits for damages against officials in their official capacity, *Sossamon v.*

*Texas*, 563 U.S. 277, 285–86 (2011), nor does it provide a damages remedy against officials in

their individual capacity, *Washington v. Gonyea*, 731 F.3d 143, 145–46 (2d Cir. 2013).

---

[5] *See, e.g.*, *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004) ("Absent undue delay in filing a motion for class certification, therefore, where a defendant makes a Rule 68 offer to an individual claim that has the effect of mooting possible class relief asserted in the complaint, the appropriate course is to relate the certification motion back to the filing of the class complaint."), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016); *Mabary v. Hometown Bank, N.A.*, 276 F.R.D. 196, 202–03 (S.D. Tex. 2011) ("[S]o long as a plaintiff timely files and diligently pursues a motion to certify her collective or class action, that motion will relate back to the date the plaintiff filed her initial class or collective action complaint, regardless of the precise sequence of defendant's offer of complete relief.  As the Fifth Circuit has explained, the relation back mechanism thereby ensures that plaintiffs have a reasonable opportunity to move for class certification without being picked off by defendants employing Rule 68 as a sword.").

[6] The court agrees with the Magistrate Judge that Russell has standing to pursue his claims for damages against Pallito and Menard.

Accordingly, the court grants Defendant Menard's Motion insofar as it seeks to dismiss for lack of standing Plaintiff's claims for injunctive and declaratory relief. The court therefore dismisses Plaintiff's claim under RLUIPA (Doc. 61 ¶¶ 65–70). The court also denies Plaintiff's Motion to Certify Class Action without prejudice. The motion may be refiled at an appropriate time.

## V.    Further Proceedings

By the court's reading, the crucial issue regarding Russell's claims against Pallito and Menard is whether the policy of providing kosher meals to Muslim prisoners rises to a violation of the First Amendment. As the Magistrate Judge rightly noted, this is an issue that is frequently resolved at summary judgment. (Doc. 63 at 33 n.6.) The court encourages the parties and the Magistrate Judge to focus on this issue first as the case proceeds.

## Conclusion

The court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's Report and Recommendation (Doc. 63).

Defendant Menard's Motion to Dismiss (Doc. 30) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED insofar as it seeks to dismiss Plaintiff's claims for injunctive and declaratory relief for lack of standing. It is otherwise DENIED.

Defendant Pallito's Motion for Judgment on the Pleadings (Doc. 33) is DENIED.

Plaintiff's Motion to Certify Class Action (Doc. 41) is DENIED WITHOUT PREJUDICE.

Dated at Rutland, in the District of Vermont, this 23 day of March, 2017.

Geoffrey W. Crawford, Judge
United States District Court

20