UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Justin Russell,

       Plaintiff,

           v.                      Civil Action No. 5:15-cv-126-gwc-jmc

Andrew Pallito,
Cynthia Mason,
Richard Bilodeau,
Lisa Menard,

       Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 121, 123, 128, 140, 141)

Plaintiff Justin Russell, a Muslim pretrial detainee under the supervision of the Vermont Department of Corrections (DOC), brings this action under 42 U.S.C. § 1983 against former DOC Commissioner Andrew Pallito, current DOC Commissioner Lisa Menard, and DOC employees Richard Bilodeau and Cynthia Mason. In his Second Amended Complaint (Doc. 61), Russell claims that a DOC policy implemented by Pallito and continued by Menard impermissibly infringed on his constitutional right to a diet conforming to his Muslim faith. (*Id.* at 3–4, ¶ 13; *id.* at 8, ¶ 41.) Russell also claims that, after he filed grievances against Mason for allegedly refusing to provide meals conforming to his religious dietary requirements, Mason unconstitutionally retaliated against him. (*Id.* at 7, ¶ 33; *id.* at 14, ¶ 77.) Finally, Russell asserts that Bilodeau violated Russell's due process rights by improperly adjudicating prison disciplinary proceedings involving Russell.

(*Id.* at 15, ¶ 84.)  Russell seeks compensatory damages, attorney's fees, and the costs of his suit.  (*Id.* at 15.)  Presently before the Court are three summary judgment motions: (1) Pallito and Menard's Motion for Summary Judgment (Doc. 123); (2) Mason and Bilodeau's Motion for Summary Judgment (Doc. 128); and (3) Russell's Motion for Partial Summary Judgment as to Pallito.  (Doc. 121.)

Also before this Court are Russell's Motion for Reconsideration of a prior Opinion and Order issued by this Court (Doc. 140), and Russell's Renewed Motion to Certify Class and Motion to Reopen Discovery.  (Doc. 141.)  In the previous Opinion and Order, the Court concluded that, because Russell was no longer in DOC custody, he lacked standing to pursue his claims for injunctive and declaratory relief, along with his claims for prospective relief brought pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1.  (Doc. 69 at 19.)  Since that Opinion and Order issued, however, Russell has been detained on new criminal charges and he is currently being held without bail.  (Doc. 140-1.)  Given that he is again under DOC supervision, Russell asks this Court to reconsider the prior dismissal of his claims for injunctive and declaratory relief, as well as his RLUIPA claim.  (Doc. 140 at 1.)  Further, the Court previously denied Russell's original Motion to Certify Class Action without prejudice and now Russell renews that motion.  (*See generally* Doc. 141.)

For the reasons set forth below, I recommend that Menard and Pallito's Motion for Summary Judgment be DENIED (Doc. 123), that Russell's Motion for Partial Summary Judgment be DENIED (Doc. 121), that Mason and Bilodeau's Motion for Summary Judgment be GRANTED (Doc. 128), that Russell's Renewed

Motion to Certify Class and Motion to Reopen Discovery be DENIED (Doc. 141), and

that Russell's Motion for Reconsideration be GRANTED.  (Doc. 140.)

## Factual and Procedural Background

The following facts are taken from the voluminous documents submitted by

the parties in support and defense of their respective motions.  The facts are

undisputed except where noted.

## I.    Parties

Russell converted to Islam in 2014, while in the custody of the DOC.  (Doc.

121-1 at 1, ¶ 2; Doc. 61 at 3, ¶ 9.)  With breaks during periods of probation,[1] Russell

was in the custody of the DOC from 2010 until November 2016.  (Doc. 121-1 at 1,

¶ 1.)  But on March 23, 2017, when the Court issued its Opinion and Order denying

Russell's claim for injunctive and declaratory relief, along with his claims for

prospective relief brought pursuant to RLUIPA, Russell was no longer in the

custody of the DOC.  (Doc. 69 at 19.)  Since that Opinion and Order issued, however,

Russell has been detained on new criminal charges.  (Doc. 140-1.)  He is currently

being held without bail.  (*Id.*)

Defendant Andrew Pallito was the Commissioner of the DOC until

September 2015.  (Doc. 61 at 2, ¶ 3; Doc. 123-1 at 1, ¶ 1.)  Defendant Lisa Menard

succeeded Pallito as the Commissioner of the DOC in September 2015.  (Doc. 61

at 2, ¶ 4; Doc. 123-1 at 1–2, ¶¶ 2–3.)  Defendant Cynthia Mason is a correctional

officer who supervised the meals hall at Northern State Correctional Facility

---

[1]  Specifically, Russell was on parole from January 2015 to March 2015 and from November 2015 to February 2016.  (Doc. 61 at 1–2, ¶ 1.)

(NSCF) during the times relevant to Russell's allegations. Defendant Richard
Bilodeau is a Correctional Facility Shift Supervisor at NSCF, where his duties
include adjudicating disciplinary hearings. (Doc. 61 at 2, ¶ 6.)

## II.    Prepackaged Religious Food Policy

On September 20, 2014, while incarcerated in Northwest State Correctional
Facility (NWSCF) in Swanton, Vermont, Russell notified NWSCF administrators
that he had converted to Islam and requested halal meals in accordance with the
dictates of his faith. (Doc. 61 at 3, ¶ 9.) Russell began receiving halal meals on
September 30, 2014. (*Id.* ¶ 12.) These halal meals were prepared on site at
NWSCF and, to the best of Russell's knowledge, were halal. (Doc. 121-1 at 1, ¶ 3.)

In October 2014, Russell was transferred to NSCF. (*Id.* at 2, ¶ 4.) In
December 2014, the DOC began testing a new religious meal program at NSCF.
(Doc. 123-1 at 6, ¶ 27.) Russell contends that Pallito "approved and implemented"
this test policy, but Pallito asserts that he "did not personally participate in or
otherwise have involvement in the decision to modify the halal diet." (Doc. 61 at 3,
¶ 13; Doc. 123-1 at 4, ¶ 17.) In the test program, Muslim inmates at NSCF were
offered a mixture of prepackaged halal and kosher meals instead of the exclusively
halal meals previously prepared on the premises. (Doc. 123-1 at 6, ¶ 27; Doc. 121-1
at 1, ¶ 4.) Specifically, the prepackaged religious meal policy utilized by the DOC
"follow[ed] a two-week cycle . . . that include[d] both halal and kosher prepackaged
entrees as components of the lunch and dinner meals." (Doc. 123-1 at 7, ¶ 34.) "The
decision to change the halal menu to prepackaged meals was based, in part, on
security concerns—jealousy and abuse of the diet by other inmates, where inmates

4

who were not truly Muslim were identifying the Muslim faith as their religion and requesting the diet, because the separate meal program [could] be perceived to possibly be a better meal." (*Id.* at 6, ¶ 28.) The DOC also determined that changing to prepackaged religious meals would "avoid cross-contamination between the religious diet food and food not on the religious diet menu." (*Id.* at 7, ¶ 29.) The prepackaged religious meals were "more expensive" than the cost of the halal meals being replaced and, indeed, the DOC was concerned that the prepackaged religious meals would significantly increase costs. (*Id.* ¶¶ 31–32.) Nevertheless, the DOC implemented the prepackaged meal program system-wide in March 2015. (*Id.* ¶ 30.) After the system-wide implementation, a number of inmates elected to stop participating in the prepackaged religious meal program, resulting in a savings of approximately $260,000 per year. (*Id.* ¶ 33.)

Russell alleges that two parts of the prepackaged religious meal program are not halal[2] according to his interpretation of his faith. First, he does not believe that the kosher prepackaged meals can be a substitute for halal meals because "different rituals and prayers apply to the slaughter of animals for kosher meat versus halal meat." (Doc. 121-1 at 2, ¶ 6.) Second, he contends that the prepackaged meals are not halal because they contain preservatives and additives, as well as trace amounts of alcohol. (*Id.* ¶ 5.) As support for his beliefs, Russell relies on his own sincere interpretation of the Islamic religion and the deposition of Dr. Ilyse

---

[2] Adherents to Islam are required to consume a diet that is halal, which simply means permissible according to the Quran. (Doc. 61 at 3, ¶ 10.) Food that is not permissible is haram, or forbidden. (*Id.*)

Morgenstein Fuerst, a Professor of Islamic Studies at the University of Vermont. (*Id.* at 2–3, ¶¶ 7, 8.)

In her deposition, Dr. Fuerst stated that debate exists in the Muslim community regarding the religious significance of alcohol used for cooking, including whether the use of alcohol-based extracts or emulsifiers are halal or haram (Doc. 134-3 at 7–8, pp. 63–66; *id.* at 10, p. 73); that there "is not a clear stance within the Islamic religion or the Muslim communities as to what additives and preservatives are halal versus haram[]" (*Id.* at 13, p. 86); and that it is uncertain whether vitamins or genetically engineered food are halal or haram. (*Id.* at 14–15, pp. 91–93.) In addition, Dr. Fuerst reviewed several of the prepackaged religious meals provided by the DOC and stated that, because the listed vitamins, genetically modified ingredients, additives, and preservatives had an unclear origin, "it is reasonable that a practicing Muslim would say I might have to avoid this." (*Id.* at 15, p. 93; *see also id.* at 15–16, pp. 95–99.) Similarly, Dr. Fuerst stated that differences exist between halal slaughtered meat and kosher meat (*id.* at 8, pp. 67–68); and that, in general, kosher and halal food are not "interchangeable" and that treating the two as similar could be perceived as offensive and a burden on the prisoner's ability to practice his or her religion. (*Id.* at 9, p. 72; *id.* at 22, p. 156.)

Pallito and Menard dispute Russell's characterization of the halal requirements as a factual matter. (Doc. 123-36 at 5–7; Doc. 123-1 at 13–16, ¶¶ 71–94.) In general, the DOC asserts that the Islamic Food and Nutrition Council of America certified that the prepackaged religious meals were halal and fit for Muslim consumption. (Doc. 123-1 at 8, ¶¶ 36–40.) Pallito and Menard also

claim that "Dr. Morgenstein Furest [sic] is not a halal food expert" and urge this Court to rely on their expert, Taysir Al-khatib, who, as the part-time Imam of the Islamic Society of Vermont, has expertise interpreting Muslim dietary law. (Doc. 123-36 at 5–6.) According to Imam Al-khatib's deposition, eating kosher food is halal and, even if kosher food were not acceptable, a Muslim may recite the *basmala* prayer, or *bi-smi llāhi l-raḥmāni l-raḥīm(i),*[3] before eating and the food will be considered halal in the eyes of God. (Doc. 123-35 at 35–36, 103–106.) Further, Imam Al-khatib states that foods with unidentifiable ingredients on the labels may be eaten because "God not that picky on, on certain little things here and there; God is bigger than that." (*Id.* at 114.) Finally, Pallito and Menard contend that "if a Muslim has a question about whether or not a food is halal he or she has the option of practicing *waraʿ*[,]" which means that the Muslim would abstain from consuming questionable foods. (Doc. 123-36 at 6 (italics added).)

But Russell asserts that he did abstain from eating the prepackaged meals "and for a time subsisted mainly on celery sticks, carrots and bread." (Doc. 121-1 at 2, ¶ 7.) According to Russell, this diet was not nutritionally adequate and caused him to lose over 30 pounds by limiting himself to items that he considered halal. (Doc. 134 at 8.) Russell also grieved the issue, and his grievance was rejected. (Doc. 134-2.) Russell appealed the rejection to Pallito, who denied Russell's request

---

[3] Given the difficulties of transcribing Arabic into English, various encyclopedias transcribe the *basmala* prayer differently. *See*, *e.g.*, C. Glassé, The New Encyclopedia of Islam (AltaMira Press rev. ed. 2001); I.R. Netton, A Popular Dictionary of Islam (Curzon Press 1997); L.W. Adamec, The A to Z of Islam (The Scarecrow Press, Inc., 2002). For consistency, the Court has adopted the version in the Encyclopedia of the Qur'ān. *See* J.D. McAuliffe, Encyclopedia of the Qur'ān (Brill Acad. Pub. 2001).

for a religiously acceptable diet after consulting with the DOC's food services vendor and a DOC administrator and determining that the "pre-packaged meals . . . meet the dietary requirements of the Muslim religion." (*Id*.) Russell contends that this letter made Pallito aware of Russell's belief that the prepackaged religious meals did not constitute proper accommodation of his religious dietary request. (Doc. 121-1 at 7, ¶ 25.) But Pallito disputes this contention, asserting that he did not personally investigate Russell's complaint and only referred Russell's grievance to the DOC administrator. (Doc. 123-1 at 12, ¶¶ 60, 66.)

Ultimately, Russell submitted a request to immediately cancel his religious diet on June 6, 2015, asserting that he submitted the request because the food he was being provided was not halal. (Doc. 143-1 at 3, ¶¶ 6–7; Doc. 142-5.)

## III.    Individual Incidents Involving Russell

As described above, Russell was transferred to NSCF on October 7, 2014 and, for the first six days in NSCF, he alleges that he received a halal meal without incident. (Doc. 61 at 5, ¶¶ 19, 20.) Then, on October 13, when Russell requested a halal meal, Defendant Mason told him that he could not receive one because he was not on the special meals list. (*Id*. ¶ 21.) Instead, Mason offered Russell either a regular lunch, a bagged lunch, or no lunch. (*Id*. ¶ 23.) Believing the bagged lunch was not halal, Russell accepted the regular lunch and later filed a grievance against Mason. (*Id*. ¶¶ 23, 24.) The following day, Russell met with Mason to process the grievance and Mason told him that the bagged lunch was halal, containing a peanut butter and jelly sandwich, an apple, and chips. (*Id*. at 5–6, ¶ 24.) When Russell informed Mason that he could not eat the bagged lunch because he had a peanut

allergy, Mason "yell[ed] that he had never told medical staff that he had a peanut allergy" and warned Russell that "he would be reported" if she determined that Russell was lying about the allergy. (*Id.* at 6, ¶ 26; *see also* Doc. 128-1 at 3, ¶¶ 16–17.) Subsequently, Mason checked with the DOC medical staff and determined that Russell had not indicated on his intake form that he had a peanut allergy when he was transferred to NSCF. (Doc. 128-1 at 3, ¶¶ 17–18.) Mason then issued Russell a disciplinary report for lying to a correctional officer. (*Id.* ¶ 19.)

During the following disciplinary hearing, Defendant Bilodeau relied on Mason's report. (Doc. 128-11 at 2.) In addition, Bilodeau noted that Russell had not declared that he was allergic to peanuts in his intake form at NSCF, writing that Russell claimed to be allergic to peanuts without "mention[ing] being allergic to peanuts during [his] intake at this facility." (*Id.* at 3.) Indeed, as the record establishes, over the course of Russell's incarceration, he had completed approximately 10 Intake Medical Screening Forms, including when he was first incarcerated, when he was reincarcerated, and when he was transferred between DOC facilities; in these forms, he never indicated that he was allergic to peanuts. (Doc. 128-2 at 3, ¶ 7; Doc. 128-28; *see generally* Doc. 138-3.) Given the discrepancies between Russell's statements and the DOC records, Russell was found guilty of "giving false information" pursuant to DOC Directive No. 410.01, Major A #11, which prohibits inmates from "intentionally misleading staff in the course of their official duty" (Doc. 128-11 at 3), and Russell was sanctioned to five days in disciplinary segregation. (Doc. 128-1 at 4, ¶ 28.) Russell administratively appealed Bilodeau's decision, acknowledging in his appeal that he "was giv[en] a major for

not letting medical [know] I had a peanut allerg[y]." (Doc. 128-34 at 3.) Bilodeau's decision was upheld in an administrative appeal. (*Id.* at 2.)

After his placement in disciplinary segregation, Russell alleges that Mason sent Russell a bagged lunch containing a peanut butter and jelly sandwich, causing Russell to go hungry. (Doc. 61 at 7, ¶ 30.) Then, sometime after his discharge from segregation, Russell claims that he "repeatedly found foreign objects in his food, including large pieces of plastic, tin foil, and hair." (*Id.* ¶ 33.) Upon complaining to Mason, Russell contends that Mason "smiled broadly and said, 'You've been really unlucky lately.'" (*Id.*) Russell also contends that the halal food trays were being washed in the same dishwasher as regular food trays (*id.* ¶¶ 35–36), and asserts that he was barred from attending religious services based on the incorrect allegation that he was disruptive. (*Id.* at 9, ¶ 43.) Eventually, Russell claims that, on March 12, 2015, he had an allergic reaction to a prepackaged religious meal containing peanuts (*id.* at 8, ¶ 42); however, the record of the medical personnel at NSCF states that "[c]linical presentation does not seem to suggest any sign of respiratory distress or allergic reaction at this time." (Doc. 128-37 at 3.) In sum, Russell points to these incidents, as well as Mason's comment, as evidence that Mason had arranged for kitchen staff to tamper with his meals in retaliation for the grievance he had filed against her. (Doc. 61 at 7, ¶ 34.) But Mason disputes this characterization, stating that she neither prepared food as part of her duties, nor delivered food trays to Russell. (Doc. 128-1 at 5, ¶¶ 35–36.)

In May 19, 2015, Russell was transferred to Southeast State Correctional Facility. (Doc. 61 at 9, ¶ 44.) There, it appears from the record, he was diagnosed

with a peanut allergy on June 11, 2015.  (Doc. 138-8 at 2.)  Russell brought this suit on June 12, 2015, while at Southeast State Correctional Facility.  (Doc. 1.)

Subsequently, on June 30, 2015, Russell was transferred back to NSCF, despite his alleged fears that Mason and Bilodeau would retaliate against him for filing the present lawsuit.  (Doc. 61 at 9, ¶¶ 45–46.)  After his transfer back to NSCF, Russell contends that on three days of Ramadan—July 1, 2, and 7, 2015— Russell received food trays containing peanut butter.  (*Id.* at 10, ¶¶ 49, 51.)  Although he was ultimately provided with a replacement tray, it "took over twenty minutes [and] he was forced to either wolf down his food or go hungry for the next 16 hours."  (*Id.* ¶ 49.)

Then, on July 30, 2015, prison officials reviewing inmate phone conversations listened to a July 29, 2015 recording that documented Russell's phone call with a former inmate.  (Doc. 128-19.)  In the recorded conversation, the former inmate appeared to instruct Russell to assault another prisoner, and Russell agreed to "handle it."  (*Id.*; *see also* Doc. 128-20.)  Subsequently, Russell was charged with attempted assault based on the phone conversation.  (Doc. 128-19.)  Bilodeau oversaw the disciplinary hearing in the matter.  (Doc. 128-23.)  Given that Russell was presently suing Bilodeau in this Court, Russell requested that Bilodeau recuse himself.  (Doc. 61 at 11, ¶ 56.)  Bilodeau refused and ultimately sanctioned Russell to 12 days in disciplinary segregation.  (Doc. 128-23 at 3.)  In reaching his decision, Bilodeau reviewed the reports of two correctional officers, who described Russell's phone conversation with the former inmate.  (*See* Doc. 128-19; Doc. 128-20; Doc. 128-23 at 3.)

## IV.    Procedural History

As noted above, Russell filed this suit on June 12, 2015, claiming pursuant to
42 U.S.C. § 1983 and RLUIPA that Pallito, Bilodeau, and Mason violated his
constitutional rights.  (Doc. 1.)  Russell amended the original Complaint on
December 2, 2015, adding Defendant Menard.  (Doc. 21.)  In Menard's deposition,
she acknowledges that she received notice of Russell's request for a specific religious
diet when she was joined to this case as a defendant.  (Doc. 137-3 at 2, 5; *see also*
Doc. 17; Doc. 19.)  Upon learning of Russell's complaints, Menard consulted with
counsel, received additional information regarding the prepackaged religious meal
program, and ultimately continued the program.  (Doc. 137-3 at 3, 5.)  The operative
complaint is now the Second Amended Complaint, which includes claims against
Menard.  (Doc. 61 at 2, ¶ 4; *see also* Doc. 63 at 2.)

In that Second Amended Complaint, Russell alleged that the DOC's
prepackaged religious food policy impermissibly infringed on his right to freely
exercise his religion in violation of the First Amendment and RLUIPA.  (Doc. 61
at 3–5, ¶¶ 9–18.)  Based on this alleged constitutional violation, Russell also sought
to be named class representative of "a prospective class of Muslim inmates, now or
formerly in the custody of the Vermont Department of Corrections, who were denied
Halal meals pursuant to policies enacted, or permitted to continue in existence, by
Defendants Pallito and Menard."  (Doc. 41 at 1.)  Russell also brought personal
claims against Mason and Bilodeau, alleging that Mason unconstitutionally
retaliated against him for filing a grievance against her (Doc. 61 at 14, ¶¶ 78–79)
and that Bilodeau violated Russell's due process rights by improperly adjudicating

the disciplinary hearings described above. (*Id.* at 14–15, ¶¶ 80–84.)  For these alleged violations, Russell sought monetary damages and equitable relief.  (*Id.* at 15–16.)

In response to Russell's allegations, Menard filed a Motion to Dismiss (Doc. 30) and Pallito filed a Motion for Judgment on the Pleadings.  (Doc. 33.)  In a Report and Recommendation addressing these motions and the Motion to Certify Class Action (Doc. 41), the undersigned Magistrate Judge recommended dismissing Russell's claim for monetary damages for failure to adequately allege the personal involvement of Menard and Pallito.  (Doc. 63 at 32–33.)  Alternatively, it was recommended that Russell's claim for monetary damages be dismissed insofar as Russell failed to allege an actual compensable injury resulting from the prepackaged religious food policy.  (*Id.* at 37.)  I further recommended denying Menard's motion with regard to Russell's claim for equitable relief brought against Menard in her official capacity (*id.* at 32–33) and denying Menard and Pallito's motions as to Russell's claims brought pursuant to RLUIPA.  (*Id.* at 34–35.)

As noted above, on March 23, 2017, the Court issued an Opinion and Order adopting the Report and Recommendation in part, and rejecting the recommendations in part.  In particular, the Court concluded that Russell had adequately alleged both Menard and Pallito's personal involvement and pleaded a compensable injury stemming from the prepackaged religious food program.  (Doc. 69 at 6, 14.)  The Court concluded, however, that Russell lacked standing to seek

13

injunctive or declaratory relief under § 1983 and RLUIPA because he was no longer in custody of the DOC. (*Id.* at 19.) Finally, the Court denied without prejudice Russell's Motion to Certify Class Action. (*Id.*)

Now, Pallito and Menard have filed a Motion for Summary Judgment, asserting that the prepackaged religious food policy did not infringe on Russell's constitutional rights (Doc. 123-36 at 4–10); that Pallito and Menard were not personally involved in creating or continuing the prepackaged religious food policy (*id.* at 10–11); and that, in any event, they are entitled to qualified immunity. (*Id.* at 11.) Russell opposes the motion (Doc. 134) and has filed a Motion for Partial Summary Judgment as to Pallito. (Doc. 121.)

In addition, Mason and Bilodeau have filed a Motion for Summary Judgment, contending that Russell's due process rights were not violated because Russell neither possessed a protected liberty interest nor received insufficient process during his disciplinary hearings. (Doc. 128 at 9–16.) Mason and Bilodeau further argue that Russell cannot state a claim for retaliation because he violated the DOC institutional rules and because he has no evidence of either Mason's personal involvement or causation. (*Id.* at 19.) Russell opposes the motion. (Doc. 138.)

Also pending before the Court are Russell's Motion for Reconsideration of the prior Opinion and Order issued by the Court (Doc. 140), and Russell's Renewed Motion to Certify Class and Motion to Reopen Discovery. (Doc. 141.) Since the Opinion and Order issued, Russell has been detained on new criminal charges and

he is currently being held without bail.[4]  (Doc. 140-1.)  Accordingly, Russell now asks this Court to reconsider the prior dismissal of his claims for injunctive and declaratory relief, as well as his RLUIPA claim.  (Doc. 140 at 1.)  Further, in his Renewed Motion to Certify Class and Motion to Reopen Discovery (Doc. 141), Russell seeks certification of a more narrowly defined class than his original motion, asserting that the "proposed class consists of all Muslim inmates within the custody of DOC who were offered prepackaged kosher meals, from when DOC first began serving those meals in late 2014, to the present, who consider the content of those meals to be in conflict with their sincerely held religious beliefs."  (*Id.* at 2.)

## Discussion

## I.    Legal Standards

### A.    Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine dispute as to any material fact" exists when factual issues materially affecting the outcome could reasonably be resolved in favor of either party.  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).  In other words, "[t]he moving party is entitled to summary

---

[4] Although neither party provided an updated docket sheet, the Court takes judicial notice of the most recent docket entries available to the Court in *State v. Justin Russell*, 1979-6-18 Cncr (Vt. Sup. Ct. Sept. 27, 2018).  *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Singh v. United States Dep't of Homeland Sec.*, 526 F.3d 72, 80 n.9 (2d Cir. 2008) (taking judicial notice of trial court docket sheet).

judgment where 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the plaintiff bears the burden of proof." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). To put it another way,

> where . . . the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings.

*Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* at 273.

In conducting this analysis, if there is a genuine dispute regarding the material facts, those facts "must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Although the Court accepts as true a nonmoving party's allegations that are supported by admissible evidence, and also gives the nonmoving party the benefit of all reasonable doubts and inferences, a nonmoving party's "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). If no genuine issue of material fact exists and the nonmoving party has had an adequate opportunity to address the issues involved by developing facts necessary to oppose summary judgment, summary judgment is proper. Fed. R. Civ. P. 56(e).

### B.     42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff may bring suit "against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (alterations in original) (quoting 42 U.S.C. § 1983).  Section 1983 does not itself create or establish a federally protected right; instead, it creates a cause of action to enforce federal rights created elsewhere, such as a federal constitutional right. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Accordingly, the U.S. Supreme Court has identified two elements of a § 1983 claim: "[A] plaintiff [(1)] must allege the violation of a right secured by the Constitution and laws of the United States, and [(2)] must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## II.    Menard and Pallito's Motion for Summary Judgment

The Court first addresses Menard and Pallito's Motion for Summary Judgment.  (Doc. 123.)  Menard and Pallito argue that their Motion for Summary Judgment should be granted for three reasons: (1) Russell's right to freely exercise his religion was not violated by the prepackaged religious meal policy; (2) neither Menard nor Pallito were personally involved in the implementation or continuation of the prepackaged religious meal plan; and (3), Menard and Pallito were entitled to qualified immunity.  (*See generally* Doc. 123-36.)  Viewing the record in the light

17

most favorable to Russell, I conclude that genuine issues of material fact preclude summary judgment in favor of Menard and Pallito. Accordingly, I recommend that their Motion for Summary Judgment be DENIED.

### A.    Free Exercise Claim against Pallito and Menard

First, concluding that the record contains sufficient evidence for a rational factfinder to find that the DOC's prepackaged religious meal policy violated Russell's right to freely exercise his religion and that the DOC policy was not rationally related to a legitimate penological interest, Pallito and Menard are not entitled to summary judgment on the merits of Russell's free exercise claim.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). But the constitutional protections afforded to prison inmates, including the right to freely exercise their religion, must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). Given this balance, "[e]xamination of [a prisoner's] free exercise claim entails application of a three-part, burden shifting framework." *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at *5 (N.D.N.Y. Oct. 17, 2007). The prisoner must establish (1) that he or she has a sincerely held religious belief, and (2) that this religious belief was substantially

burdened.[5] *Salahuddin*, 467 F.3d at 274. Once a prisoner has made this showing, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. After the defendants articulate such a justification, the prisoner must establish that "the policy is not reasonably related to legitimate penological interests." *Guiffere*, 2007 WL 3046703, at *6; *see also Salahuddin*, 467 F.3d at 274. With this legal structure in place, each factor is examined below, bearing in mind that "free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.'" *Ford*, 352 F.3d at 588 (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).

### 1.      Sincerely Held Religious Beliefs

Scrutiny regarding a prisoner's religious beliefs "extends only to whether a [prisoner] sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590 (quoting *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.

---

[5] The Second Circuit has not yet decided whether, "to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006). In this case, although Russell states that "it is far from clear whether the substantial burden test even applies," he asserts that he "clearly satisfies this test." (Doc. 134 at 2.) As a result, this Court assumes that the substantial burden test applies. *See id.* (proceeding under the assumption that the substantial burden test applies); *accord Smith v. Artus*, 9:07-CV-1150 NAM/ATB, 2015 WL 9413128, at *9 (N.D.N.Y. Dec. 22, 2015) ("In the absence of guidance from a higher court, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest."); *Washington v. Chaboty*, No. 09 Civ. 9199(PGG), 2015 WL 1439348, at *9 n.12 (S.D.N.Y. Mar. 30, 2015) ("Similarly here, because [plaintiff] has not argued that the substantial burden test is inapplicable, this Court has assumed that it applies."); *Rossi v. Fishcer*, No. 13-cv-3167 (PKC)(DF), 2015 WL 769551, at *6 n.8 (S.D.N.Y. Feb. 24, 2015) ("[T]he Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise.").

1996)).  "[T]he relevant inquiry is not whether, as an objective matter, the belief is accurate or logical . . . [but] . . . whether the beliefs . . . are sincerely held and whether they are, in [the prisoner's] own scheme of things, religious." *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (emphasis, citation, internal quotation marks omitted).  The test is subjective because an objective test "would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be." *Jolly*, 76 F.3d at 476.  In particular, "[t]he opinions of . . . religious authorities cannot trump the [prisoner's] sincere and religious belief." *Ford*, 352 F.3d at 590.  On the other hand, scrutinizing a "prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Id.* at 588 (quoting *Patrick*, 745 F.2d at 157).  "While it is a delicate task to evaluate religious sincerity without questioning religious verity, [the] free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions." *Id.* (emphasis omitted in original) (quoting *Jolly*, 76 F.3d at 476).

For summary judgment purposes, Pallito and Menard concede that Russell has a sincerely held religious belief.[6]  (Doc. 123-36 at 5.)  And indeed, the record is replete with evidence that Russell sincerely believes that the prepackaged meals provided to him were inconsistent with his beliefs as a Muslim.  Throughout his

---

[6] Pallito and Menard "reserve the right to dispute at trial both the sincerity of [Russell's] religious beliefs and the religiosity of his alleged beliefs."  (*See* Doc. 123-36 at 5 n.1.)

deposition, Russell indicated that the prepackaged meals were haram because they had "preservatives in them, additives in them, sedatives in them, animal-based products or alcohol." (Doc. 134-5 at 4; *see also* 123-18 at 9–10.) In addition, according to Russell, "anything that's prepackaged, anything that was assembled on an assembly line" is haram (Doc. 134-5 at 3; Doc. 123-18 at 6), along with foods containing genetically modified organisms (GMOs). (Doc. 134-5 at 6.) As an example, Russell stated a prepackaged beef stew was not halal because of its "nonrefrigerated[] ingredients" and because "[i]t's not fresh. It's not made from scratch. It comes in a box." (Doc. 123-18 at 8.) In general, from Russell's perspective, "Halal food consists of everything 100 percent fresh and natural." (Doc. 134-5 at 8.) With regard to the kosher prepackaged meals, Russell considers kosher slaughtered meat to be haram because there are "[d]ifferent religious views and preferences" involved in the slaughter of kosher meat. (*Id.* at 9.) Russell bases his understanding of the proper Muslim diet on his reading of the Quran, as well as "additional information research . . . [o]n Google." (*Id.* at 8.) Further, rather than consuming food that violated his beliefs, Russell abstained from eating the prepackaged religious meals "and for a time subsisted mainly on celery sticks, carrots and bread" (Doc. 121-1 at 2, ¶ 7), causing him to lose over 30 pounds. (Doc. 134 at 8.) In sum, Russell's deposition and supporting materials make plain his steadfast adherence to a "strict Halal diet" that is incompatible with the prepackaged religious meals provided by the DOC. (Doc. 123-18 at 9.)

  Russell's beliefs regarding the halal requirements are supported by Dr. Ilyse Morgenstein Fuerst's deposition. (*See generally* Doc. 134-3.) Dr. Fuerst stated that

debate exists in the Muslim community regarding the religious significance of alcohol used for cooking, including whether the use of alcohol-based extracts or emulsifiers are halal or haram (*id.* at 7–8, pp. 63–66; *id.* at 10, p. 73); agreed that there "is not a clear stance within the Islamic religion or the Muslim communities as to what additives and preservatives are halal versus haram[]" (*id.* at 13, p. 86); and said that it is uncertain whether either vitamins or genetically engineered food are halal or haram.  (*Id.* at 14–15, pp. 91–93.)  In addition, Dr. Fuerst reviewed several of the prepackaged religious meals provided by the DOC and stated that, because the listed vitamins, genetically modified ingredients, additives, and preservatives had an unclear origin, "it is reasonable that a practicing Muslim would say I might have to avoid this."  (*Id.* at 15, p. 93; *see also id.* at 15–16, pp. 95–99.)  Similarly, Dr. Fuerst stated that differences exist between halal slaughtered meat and kosher meat (*id.* at 8, pp. 67–68); and that, in general, kosher and halal food is not "interchangeable" and that treating the two as similar could be perceived as offensive and a burden on the prisoner's ability to practice his or her religion.  (*Id.* at 9, p. 72; *id.* at 22, p. 156.)  In short, viewing the record in the light most favorable to Russell, Dr. Fuerst's deposition provides evidence that other Muslims have adopted the halal requirements espoused by Russell, demonstrating that Russell's beliefs are verifiable and are not motivated by "deception and fraud." *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157).

Accordingly, I conclude that Russell has submitted admissible evidence to establish at trial that he has a sincerely held religious belief in a strict application of the halal requirements.

### 2.    Substantial Burden

Although Menard and Pallito do not question the sincerity of Russell's beliefs in advancing their motion, they do argue that those beliefs were not substantially burdened by the prepackaged religious food policy.  (Doc. 123-36 at 5–6.)  Concluding that the record reveals a genuine dispute of material fact as to whether Russell's sincerely held religious beliefs were substantially burdened, summary judgment should not be granted on this issue.

"[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Jolly*, 76 F.3d at 477 (internal quotation marks omitted); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding a substantial burden where individual is forced "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . , on the other hand").  In the context of a prisoner's religious diet, the Second Circuit has stated "that to deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."  *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004).  A particular dietary practice need not be religiously mandated for a policy to substantially burden that practice, *Ford*, 352 F.3d at 594; instead, the question is whether a specific religious diet is of central importance to the prisoner's practice of the religion, not whether the prisoner's interpretation of the dietary restrictions is correct.  *Id.*; *McEachin*, 357 F.3d at 203; *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981) ("[I]t

is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation.").  Finally, the burden must be substantial, not *de minimis*: "[T]he mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions [is] a *de minimis* burden." *Ford*, 352 F.3d at 594 n.12; *see Leach v. N.Y.C.*, No. 12 Civ. 3809(PAC)(JCF), 2013 WL 3984996, at *2 (S.D.N.Y. Aug. 2, 2013) ("The intermittent failure to provide incarcerated individuals with food complying with their religious dietary restrictions is a *de minimis* imposition falling far short of the substantial burden requirement.").

Viewing the record in the light most favorable to Russell, he has offered sufficient admissible evidence to establish a material dispute over whether the DOC policy substantially burdened his religious beliefs. *Jolly*, 76 F.3d at 477.  As stated above, it is assumed that Russell sincerely believes that his strict interpretation of the halal requirements is central to his practice of Islam.  (*See, e.g.*, Doc. 134-5 at 4; *see also* Doc. 123-18 at 9–10.)  And further, Dr. Fuerst's deposition establishes that Russell's understanding of the dietary restrictions has some religious support (Doc. 134-3 at 15, p. 93; *see also id*. at 15–16, pp. 95–99), demonstrating that Russell's beliefs are not "so bizarre . . . as not to be entitled to protection under the Free Exercise Clause." *Ford*, 352 F.3d at 594 (alteration in original) (quoting *Thomas*, 450 U.S. at 715).  Given Russell's articulated beliefs, the DOC policy of providing prepackaged meals forced Russell either to abandon his strict halal

requirements or to violate his beliefs. Such a choice is plainly a substantial burden under Second Circuit precedent. *See McEachin*, 357 F.3d at 204. In his Second Amended Complaint, moreover, Russell asserts that "because he could not be sure that anything . . . was Halal," he began to abstain from eating. (Doc. 61 at 8, ¶ 37.) As a result of his abstention, Russell states that he lost 30 pounds. (Doc. at 134-1 at 19, ¶ 94.) "[F]orcing [Russell] to choose between his religion and his health [also] imposed a substantial burden on the exercise of his religious beliefs." *Houston v. Schriro*, No. 11 Civ. 7374(HB), 2013 WL 4457375, at *8 (S.D.N.Y. Aug. 20, 2013).

Pallito and Menard's arguments in favor of summary judgment are not persuasive. (*See generally* Doc. 123-36 at 5–7.) In arguing that Russell's religious beliefs were not substantially burdened, Pallito and Menard first contend that "Dr. Morgenstein Furest [sic] is not a halal food expert" and urge this Court to rely on their expert, Imam Al-khatib. (*Id*. at 5–6.) For example, according to Imam Al-khatib's deposition, eating kosher food is halal and, even if kosher food were not acceptable, a Muslim may say the *basmala* before eating and the food will be considered halal in the eyes of God. (Doc. 123-35 at 35–36, 103–106.) Further, Imam Al-khatib stated that foods with unidentifiable ingredients on the labels may be eaten and are not haram. (*Id*. at 114.) Finally, Pallito and Menard contend that "if a Muslim has a question about whether or not a food is halal he or she has the option of practicing *wara'* and abstaining from consuming the questionable foods." (Doc. 123-36 at 6 (italics added).) Accordingly, Pallito and Menard contend that

providing prepackaged kosher meals to Russell did not substantially burden his beliefs.[7]

But Pallito and Menard's argument entirely depends on pitting their expert against Russell's expert; and, as a general matter, a summary judgment motion is particularly ill-suited for resolving such a "battle of experts." *See*, *e.g.*, *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 824 (E.D.N.Y. 1999) ("Resolution of the battle of experts is a matter best suited for trier of fact."). Moreover, in focusing their argument on whether Russell's beliefs are correct, Pallito and Menard ask this Court "to distinguish important from unimportant religious beliefs, a task for which . . . courts are particularly ill-suited." *Ford*, 352 F.3d at 594. Although Imam Al-khatib construes the halal requirements in a more flexible manner, there is direct evidence that Russell does sincerely believe in his strict interpretation, that this belief is central to his practice of Islam, and that his belief has some religious support. (Doc. 134-3 at 15, p. 93; *see also id.* at 15–16, pp. 95–99.) As the Second Circuit has made clear, courts must avoid "the unnavigable road of attempting to resolve intra-faith disputes over religious law and doctrine." *Ford*, 352 F.3d at 593; *see also McEachin*, 357 F.3d at 201 ("Our founding principles require that courts

---

[7] Pallito and Menard also assert "the Court[s] in this circuit have clearly held that a Muslim inmate's free exercise of religion is not burdened by being served kosher meals." (Doc. 123-36 at 7.) At best, this argument reflects a misunderstanding of the cases cited in their Memorandum, which neither establish the precedent claimed nor contain facts that are analogous to the instant case. For example, in *Cox v. Kralik*, the plaintiff conceded that kosher meals did not violate his personal understanding of the halal requirements. No. 05 Civ. 5917(DLC), 2006 WL 42122, at *2 (S.D.N.Y. Jan. 6, 2006). Here, by contrast, Russell does not make this concession and, indeed, one of his central claims is that, according to his sincerely held religious beliefs, kosher meals are *not* halal. Similarly, the Second Circuit's statement in a footnote that "Kosher meat is prepared in a way that satisfies all the requirements of Halal meat" does not constitute the holding of *Perez v. Westchester Cty. Dep't of Corr.*, 587 F.3d 143, 144 n.1 (2d Cir. 2009). The question in *Perez* was whether attorney's fees would be available to the plaintiffs, a question that is immaterial to the present case.

resist the dangerous temptation to try to judge the significance of particular

devotional obligations to an observant practitioner of faith."). Instead, the relevant

question in determining if a prisoner's beliefs were "substantially burdened" is

whether a specific religious diet is of central importance to *the prisoner's* practice of

the religion, *Ford*, 352 F.3d at 593–94, the testimony of the Imam proffered by

Menard and Pallito "is not determinative of this issue" for purposes of summary

judgment. *Id.* at 594.

In sum, viewing the factual allegations in favor of Russell, a rational

factfinder could conclude that Russell's strict halal requirements are central to his

practice of Islam (*see, e.g.*, Doc. 134-5 at 4; *see also* Doc. 123-18 at 9–10), and,

further, that the DOC policy of providing prepackaged religious meals forced

Russell either to abandon his halal requirements, to eat nutritionally inadequate

meals, or to violate his beliefs. Accordingly, Pallito and Menard are not entitled to

judgment as a matter of law on this question.

### 3.    Reasonably Related to Legitimate Penological Interests

At this juncture, it is incumbent on Menard and Pallito "to articulate

palpably legitimate penological concerns" to justify their refusal to provide Russell

with a diet that conforms with his religious beliefs. *Guiffere*, 2007 WL 3046703,

at *6. "Typically, defendants in similar cases offer up the financial burden

associated with affording inmates particular diets, including those involving

preparation and serving of Halal meals," *id.*, or assert that security concerns

prevent the institution from honoring the plaintiff's religious beliefs. *Salahuddin v.

Coughlin*, 993 F.2d 306, 309 (2d Cir. 1993); *see also O'Lone v. Estate of Shabazz*,

27

482 U.S. 342, 348 (1987) ("The limitations on the exercise of constitutional rights

arise both from the fact of incarceration and from valid penological objectives—

including deterrence of crime, rehabilitation of prisoners, and institutional

security."); *see also Omaro v. O'Connell*, No. 6:14-CV-06209 (MAT), 2016 WL

8668508, at *5 (W.D.N.Y. Nov. 4, 2016) (finding connection between defendant's

actions and the "penological interests of cost" (internal quotation marks omitted)).

After prison officials articulate the penological concerns, the court must then

balance those concerns against an inmate's First Amendment right to freely

exercise his or her religion; "that determination is 'one of reasonableness, taking

into account whether the particular [act] affecting [the] constitutional right . . . is

reasonably related to legitimate penological interests.'" *Guiffere*, 2007 WL 3046703,

at *6 (alterations in original) (quoting *Benjamin*, 905 F.2d at 574).  Specifically, in

evaluating the constitutionality of a restriction, four factors are considered:

> 1) whether there is a rational relationship between the regulation and
> the legitimate government interests asserted; 2) whether the inmates
> have alternative means to exercise the right; 3) the impact that
> accommodation of the right will have on the prison system; and
> 4) whether ready alternatives exist which accommodate the right and
> satisfy the governmental interest.

*Benjamin*, 905 F.2d at 574 (citing *Turner v. Safley*, 482 U.S. 78, 89–90 (1987)).  An

inquiry into these factors—dubbed the *Turner* factors—is particularly fact-laden,

and generally ill-suited for resolution on summary judgment.  *See generally Marria*

*v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (holding that fact issues

existed as to whether ban on literature and assembly of religious group was

reasonably related to legitimate penological interests); *Show v. Patterson*, 955 F.

Supp. 182, 190–91 (S.D.N.Y. 1997) (finding fact issues precluding summary judgment regarding whether strip search of Muslim inmates was reasonably related to legitimate penological interests).

In this case, addressing the first and third *Turner* factors, Menard and Pallito assert that "the change in the halal diet menu was reasonably related to legitimate penological objectives and was made with an eye towards . . . alleviating jealousy and security concerns amongst inmates." (Doc. 123-36 at 9.) Along with security concerns arising from inmate jealousy, they also state that the switch to prepackaged halal foods was based, "in part, on an attempt to avoid cross-contamination between religious diet food and food not on the religious menu." (*Id.*) But aside from these conclusory assertions, Menard and Pallito cite to little record evidence to establish the existence of these penological concerns at the time of the change in food policy or to demonstrate that the prepackaged religious food policy was rationally related to these concerns.[8] *See Salahuddin*, 467 F.3d at 276 (declining summary judgment where record evidence did not show that the disputed official conduct was actually motivated by a legitimate penological interest).

---

[8] In addition, Menard and Pallito assert that "[a]n additional unanticipated benefit resulting from the menu change to prepackaged meals was a cost savings to the VDOC in the amount of approximately $260,000." (Doc. 123-36 at 9.) Given this statement, it is plain that the prepackaged religious food policy was not implemented with a view to reducing the financial burden on the DOC. And indeed, Arnell stated in his deposition that, in assessing the prepackaged religious food policy's viability, the DOC was concerned "that we were going to actually spend a lot more money if everybody decided to participate." (Doc. 123-12 at 12.) The defendants' burden on summary judgment is to "point[ ] to [something] in the record suggesting that the [denial of religious exercise] *was viewed as* preventing [the asserted penological concerns]." *Salahuddin*, 467 F.3d at 277 (all but last alteration in original) (quoting *Turner v. Safley*, 482 U.S. 78, 98 (1987)). Accordingly, the post hoc financial justifications offered by Menard and Pallito do not satisfy this burden. *Id.*

For example, although "there is no question that prison safety and security are legitimate (as well as compelling) penological interests," *Marria*, 200 F. Supp. 2d at 294, neither Menard nor Pallito point to any evidence showing inmate jealousy caused security concerns at the time the prepackaged religious food policy was implemented. (*See generally* Doc. 123-36 at 7–10.) Similarly, Menard and Pallito's claims regarding "cross-contamination" are not supported by any evidence that the freshly made halal meals were prepared in a way that risked contamination. (*Id.* at 9.) Menard and Pallito reference the deposition of Robert Arnell—a DOC supervisor—but, at most, Arnell's deposition simply repeats the conclusory arguments that a "separate meal program can create jealousy" and "that there could be cross-contamination and things that occur within the secure environment that make it difficult to control." (Doc. 123-12 at 6.) Put another way, Arnell's deposition fails to "close the circle" because it does not point to particular security or cross-contamination concerns that motivated the prepackaged religious food policy, nor does Arnell's deposition explain how the prepackaged religious food policy was intended to address these concerns.[9] *Salahuddin*, 467 F.3d at 276–77 ("[O]nce a prisoner shows that a prison regulation impinges on a protected right,

---

[9] In part, moreover, Arnell's deposition relies on the hearsay statements of DOC food service supervisors, which are inadmissible for summary judgment purposes. Fed. R. Civ. P. 56(c)(4) (providing that affidavits in support of and against summary judgment "set out facts that would be admissible in evidence"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). According to Arnell, these food service supervisors "were bringing up concerns about preparation of halal and kosher meats, concerns about security issues with the inmates. And it was—it was becoming a topic of conversation at our quarterly food service meetings." (Doc. 123-12 at 5–6.) These statements are offered as proof of the matter asserted and so they are inadmissible hearsay. Fed. R. Evid. 801(c)(2) (defining hearsay as an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement").

prison officials must show that the disputed official conduct was motivated by a legitimate penological interest."); *see also Turner*, 482 U.S. at 89–90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). Absent such evidence, summary judgment cannot be granted in favor of Menard and Pallito. *See Salahuddin*, 993 F.2d at 309 (concluding that conclusory claims regarding security concerns and alternative methods of worship were not sufficient to grant summary judgment). To be sure, Menard and Pallito may ultimately establish that the switch to prepackaged meals was reasonably related to a legitimate penological interest, such as maintaining institutional security and preserving order. But such a determination is properly left to the trier of fact based on the record before this Court.

As to Menard and Pallito's claims that security concerns arose "in part . . . [from] abuse of the diet by other inmates, where inmates who were not truly Muslim were identifying the Muslim faith as their religion and requesting the diet" (Doc. 123-36 at 9), Menard and Pallito again fail to adduce any evidence suggesting that inmates were falsifying their religious identities. *See Salahuddin*, 993 F.2d at 309. But more importantly, justifying the prepackaged religious food policy on the grounds that some religious adherents were not practicing Islam in the correct manner allows any DOC official to impermissibly "judge the significance of particular devotional obligations to an observant practitioner of faith." *McEachin*, 357 F.3d at 201. Granting summary judgment based on such a "seemingly value-based argument" is inappropriate, *Marria*, 200 F. Supp. 2d at 295, particularly

31

because the Second Circuit has clearly stated that a dietary practice need not be religiously mandated to be protected.  *Ford*, 352 F.3d at 594.

Menard and Pallito's arguments do not fare better under the second and fourth *Turner* factors.  *See Benjamin*, 905 F.2d at 574.  Menard and Pallito contend that Russell had an alternative means of exercising his free exercise right because he could have either recited the *basmala* prior to eating the prepackaged meals, eaten meals that did not contain meat, or practiced *wara'* and abstained from consuming meals that contained questionable foods.  (Doc. 123-36 at 9–10.)  But these arguments rest on a specific interpretation of halal, an interpretation not necessarily embraced by all practicing Muslims.  (*See* Doc. 134-3 at 9, p. 72.)  Instead, as Dr. Fuerst stated, these alternatives fall within "a range of practice and a range of maybe day-to-day interpretation for your average Muslim."  (*Id.* p. 70.)  Indeed, Russell disputes the religious import of the purported alternatives, stating that Menard and Pallito's argument "delves into matters of religious doctrine."  (Doc. 134 at 8.)  Similarly, to the extent Menard and Pallito argue that Russell could have availed himself of a vegetarian meal plan, Russell asserts that the alternative diets advocated by Menard and Pallito were not nutritionally adequate and caused him to lose over 30 pounds by limiting himself to items that he considered halal.  (*Id.*)  Menard and Pallito have presented no evidence to counter this assertion.  Accordingly, viewing Russell's statements in the light most favorable to Russell and bearing in mind that doctrinal interpretation is not within the judicial function, *see Thomas*, 450 U.S. at 716, I cannot conclude that the

reasonable alternatives proffered by Menard and Pallito are sufficient to grant summary judgment under *Turner*'s second and fourth factors.

In sum, Menard and Pallito have not provided sufficient justification to conclude that "there is no genuine dispute of material fact to be decided with respect to any essential element of [Russell's free exercise] claim." *Guiffere*, 2007 WL 3046703, at *3. The record, viewed in the light most favorable to Russell, establishes that disputes remain as to whether Russell's sincerely held religious beliefs were substantially burdened and, further, as to whether the penological concerns advanced by Menard and Pallito were rationally related to the prepackaged religious food policy. Accordingly, Menard and Pallito are not entitled to summary judgment on the merits of Russell's claim.

### B.     Personal Involvement

I next turn to Menard and Pallito's argument that they were not personally involved in the alleged deprivation of Russell's constitutional rights. (*See* Doc. 123-36 at 10–11.) Concluding that a rational trier of fact could find that Menard and Pallito were personally involved, summary judgment is not appropriate.

Personal involvement of a defendant in an alleged constitutional deprivation is "a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (internal quotation marks omitted); *Jamison v. Fischer*, No. 11 Civ. 4697 RJS, 2012 WL 4767173, at *3 (S.D.N.Y. Sept. 27, 2012) ("[L]iability under § 1983 turns on a defendant's personal involvement in the alleged constitutional deprivations."). Because personal involvement is a prerequisite under § 1983, a supervisor's liability may not be premised on the

respondeat superior or vicarious liability doctrines, "[n]or may a [supervisor] be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98 CIV. 6722(DLC), 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000). Instead, a supervisor may be liable where there was:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[10]

At issue in this case are the second and third categories of supervisory liability. Under both categories, personal involvement hinges on the supervisor's knowledge. For example, under the third category, "it is not sufficient that such a policy or practice continued to exist during [the supervisor's] tenure; [the supervisor] must have known of it as well." *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health of State of N.Y.*, 189 F.3d 273, 278 (2d Cir. 1999). Similarly, under the second category, a supervisor may be liable for failing to remedy a wrong if the evidence demonstrates that the supervisor is sufficiently

---

[10] In *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Id*. at 139; *see also Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test . . . after *Iqbal*"). Still, the Second Circuit has not specifically overruled *Colon*, and this Court continues to treat it as good law. *See, e.g., Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015); *see also Martinez v. Perilli*, No. 09 Civ. 6470(WHP), 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal*.").

familiar with the nature of the prisoner's grievance. *McKenna v. Wright*, No. 01

Civ. 6571(HB), 2004 WL 102752, at *6 (S.D.N.Y. Jan. 21, 2004). This is a close

question of fact and one that cannot be easily resolved on summary judgment.

*Cabassa v. Oshier*, No. 9:11–CV–01237 (MAD/CFH), 2013 WL 1183296, at *8

(N.D.N.Y. Mar. 21, 2013) (stating that personal involvement "is a question of fact

[that] must be satisfied as to each individual defendant"); *see also Williams*,

781 F.2d at 323 (citing Fed. R. Civ. P. 56(c)). On the one hand, courts have

concluded that "[p]ersonal involvement will be found . . . where a supervisory official

receives and acts on a prisoner's grievance or otherwise reviews and responds to a

prisoner's complaint." *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002);

*Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *13 (S.D.N.Y.

Apr. 23, 2002) ("[W]here a supervisory official receives and acts on a prisoner's

grievance (or substantively reviews and responds to some other form of inmate

complaint), personal involvement will be found."); *Van Pelt v. Finn*, No. 92 Civ. 2977

(MBM), 1993 WL 465297, at *7 (S.D.N.Y. Nov. 12, 1993) (denying summary

judgment where supervisor had notice of the retaliatory motive behind the

prisoner's reassignment). But on the other hand, courts have also determined that

neither the mere receipt of a grievance letter nor a pro forma denial establish that a

supervisor had the requisite personal involvement. *See Joyner v. Greiner*, 195 F.

Supp. 2d 500, 506 (S.D.N.Y. 2002); *Rivera v. Goord*, 119 F. Supp. 2d 327, 344

(S.D.N.Y. 2000). Likewise, other courts have concluded that a supervisor who

forwards a grievance letter to the appropriate subordinates is not personally

involved. *See*, *e.g.*, *Ramos v. Artuz*, No. 00 CIV 0149 LTS HBP, 2001 WL 840131

35

at *8 (S.D.N.Y. July 25, 2001) (finding no personal involvement where defendant-supervisor forwarded inmate's complaint letters to appropriate subordinates).

In this case, with regard to Pallito's personal involvement, the record indicates that Russell appealed his grievance to Pallito, who personally denied Russell's request for a religiously acceptable diet. (*See* Doc. 134-2.) In doing so, Pallito wrote that he denied Russell's request after consulting with the DOC's food services vendor and a DOC administrator and determining that the "pre-packaged meals . . . meet the dietary requirements of the Muslim religion." (*Id*.) The content of this administrative denial is adequate for a rational jury to conclude that Russell informed Pallito of the purportedly unconstitutional acts and that Pallito failed to remedy the wrong despite being sufficiently familiar with Russell's claim. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 430–31 (S.D.N.Y. 2010) ("A supervisor's detailed, specific response to a plaintiff's complaint suggests that the supervisor has considered the plaintiff's allegations and evaluated possible responses."). Moreover, Pallito's knowledge of the allegedly unconstitutional policy and his subsequent decision to continue the policy provides sufficient evidence for a rational factfinder to conclude that Pallito was personally involved under the third category of supervisor liability. *See Hernandez*, 341 F.3d at 145; *K & A Radiologic Tech. Servs., Inc.*, 189 F.3d at 278.

Similarly, Russell has presented some evidence under the third category to establish Menard's personal involvement. In Menard's deposition, she acknowledged that she received notice of Russell's request for a specific religious diet when she was joined to this case as a defendant. (Doc. 137-3 at 2, 3; *see also*

Doc. 17; Doc. 19.)  Upon learning of Russell's complaints, Menard consulted with counsel, received additional information regarding the prepackaged religious meal program, and ultimately continued the program.  (Doc. 137-3 at 3, 5.)  For the purposes of summary judgment, this evidence is sufficient for a rational factfinder to conclude that Menard had sufficient knowledge of the prepackaged religious food policy to be personally involved in allowing the policy to continue.  *K & A Radiologic Tech. Servs., Inc.*, 189 F.3d at 278.

Moreover, Menard and Pallito do not dispute that they had knowledge of Russell's grievance and continued the prepackaged religious food policy despite that knowledge.  (*See generally* Doc. 123-36.)  Instead, they argue that they were not personally involved because, pursuant to the relevant DOC Directives, the DOC Commissioner does not oversee the food service operations or the formulation of menus; rather, those duties are delegated to the Director of Administrative Services.  (*Id.* at 10–11.)  By statute, however, the DOC Commissioner has the ultimate authority "to establish and administer programs and policies for the operation of the correctional facilities."  Vt. Stat. Ann. tit. 28, § 102(b)(2).  And indeed, Menard and Pallito concede that "the Commissioner provides general guidance regarding the VDOC's food service operations and establishes the minimum requirements for the VDOC's menu planning."  (Doc. 123-36 at 10.)  Accordingly, even though Menard and Pallito may have delegated the day-to-day responsibilities for food service operations, they knew of the allegedly unconstitutional policy and had the authority to discontinue that policy.  *See Vega v. Artus*, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) ("To determine personal

responsibility in such a case, the grievance must allege an 'ongoing' constitutional violation that the supervisory official who reviews the grievance can remedy directly.").  Given that Menard and Pallito nevertheless elected to continue the policy, a rational jury could conclude that Menard and Pallito were personally involved.  *See Hernandez*, 341 F.3d at 145.

Based on the foregoing, summary judgment is not appropriate on this issue.

## C.    Qualified Immunity

Finally, the Court concludes that Menard and Pallito's conclusory arguments provide no basis for granting qualified immunity at the summary judgment stage and that, in any case, the record, viewed presently in the light most favorable to Russell, does not support qualified immunity.

The doctrine of qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin*, 467 F.3d at 273 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the Court engages in a two-step inquiry.  *Id.*  First, "[the Court] must consider whether the plaintiff's factual allegations, both those unchallenged and those as to which the record creates a genuine dispute, 'show the [official's] conduct violated a constitutional [or statutory] right.'"  *Id.* (all but first alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  This first inquiry is the same inquiry as the one undertaken in assessing a summary judgment motion.  *Id.*  If a violation of a right can be shown, "the next, sequential step is to ask whether the right was clearly established."  *Id.*

38

(quoting *Saucier*, 533 U.S. at 201). "A right whose existence is indicated by prior case law with reasonable specificity is clearly defined within the meaning of this doctrine." *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996) (internal quotation marks omitted). Even if the right in question was clearly established at the time of the alleged violation, however, summary judgment may still be granted

> if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

*Id*.

As an initial matter, although they assert qualified immunity, Menard and Pallito fail to adequately brief the issue or point to any facts in the record supporting their claim. Instead, they merely recite the applicable law and state that they "are entitled to qualified immunity because [Russell's] constitutional and federally protected right[s] to free exercise of religion were not violated and [they] were not responsible for creating, or allowing the continuance of, a policy or custom under which unconstitutional practices occurred." (Doc. 123-36 at 12.) In the Second Circuit, "[a]ffirmative '[d]efenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy.'" *Shechter v. Comptroller of City of N.Y.*, 79 F.3d 265, 270 (2d Cir. 1996) (second alteration in original) (quoting *Nat'l Acceptance Co. of Am. v. Regal Prods., Inc.*, 155 F.R.D. 631, 634 (E.D. Wis. 1994)). This is particularly true where, as in this case, Menard and Pallito seek to resolve the merits of the case by relying on qualified immunity. *See Levine v. Merrill Lynch*, 09 Civ. 304 (PGG), 09 Civ. 672

(PGG), 2009 WL 10691070, at *2 (S.D.N.Y. Dec. 22, 2009) (noting that the Second

Circuit requires additional facts if the affirmative defense would resolve "the

ultimate merits of a case").  Moreover, this Court has specifically declined to

address qualified immunity where, as here, the defendants affirmatively raised

qualified immunity but neglected to adequately brief the issue.  *Brunette v. City of

Burlington, Vermont*, Case No. 2:15-CV-00061, 2018 WL 4146598, at *37 (D. Vt.

Aug. 30, 2018); *see also Jimmo v. Sebelius*, No. 5:11-cv-17, 2011 WL 5104355, at *22

n.13 (D. Vt. Oct. 25, 2011) (declining to address alleged grounds for dismissal due to

"the complexity of the legal issues, the parties' cursory treatment of the issues, and

the current stage of the litigation[.]") (internal quotation marks omitted) (citing

*Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011)).

Accordingly, Menard and Pallito's "bald assertion provides no basis for a ruling in

their favor," and the Court need not address their conclusory and inadequately

briefed claim for qualified immunity.  *Shechter*, 79 F.3d at 270; *see also Alexander v.

Schenk*, 118 F. Supp. 2d 298, 302 (N.D.N.Y. 2000) (denying qualified immunity

where defendants "provided no facts to support an inference that it was reasonable

to believe their acts did not violate [p]laintiff's First Amendment rights"); *Jackson

on Behalf of Z.J. v. City of Middletown*, 2017 WL 2218304, at *4 (D. Conn. May 19,

2017) (declining to grant summary judgment on the basis of qualified immunity

because the defendants did not "show what the relevant state of the law was at the

time of the incident in question"); *Perkins v. Teele*, CIVIL ACTION NO. 3:15-CV-

01137 (JCH), 2018 WL 3541864, at *4 (D. Conn. July 23, 2018) (declining to grant

summary judgment based on a qualified immunity defense that was "inadequately briefed by the defendants").

In any case, viewing the sparse facts in the light most favorable to Russell, as the Court must, qualified immunity cannot shield Menard and Pallito from liability. As discussed above, a rational jury could conclude that Russell's sincerely held religious beliefs were substantially burdened by the DOC's prepackaged religious food policy, satisfying the first step of the qualified immunity analysis. *See Salahuddin*, 467 F.3d at 273. Next, it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford*, 352 F.3d at 597; *see also Benjamin*, 905 F.2d at 579; *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975). Although the Second Circuit has not specifically recognized a prisoner's right to the specific halal diet claimed by Russell, "courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established." *Ford*, 352 F.3d at 597. Finally, a rational jury could also conclude that it was objectively unreasonable for Menard and Pallito to determine that the prepackaged religious food policy did not violate Russell's constitutional rights. *See In re State Police Litig.*, 88 F.3d at 123. As discussed above, Pallito's response to Russell's grievance suggests that Pallito had notice of the alleged violation of Russell's constitutional rights (*see* Doc. 134-2) and, likewise, Menard's joinder in this case and subsequent continuation of the policy provides some evidence that she had notice. (Doc. 137-3 at 2, 3; *see also* Doc. 17; Doc. 19); *see Muhammad v. San Joaquin Cty. Jail*, No. CIV.S-02-0006 LKK CMK P., 2006 WL 1282944, at *7 (E.D. Cal. May 10, 2006) ("In order to ascertain the reasonableness

of each defendants conduct, it is first necessary to ascertain whether each defendant

has sufficient notice of the alleged violations of plaintiff's constitutional rights so as

to create a duty to inquire whether plaintiff's religious dietary needs were being

met."), *report and recommendation adopted*, No. CIV S-02-0006 LKK CMK P.,

2006 WL 2082249 (E.D. Cal. July 25, 2006).  Given that Pallito and Menard

arguably had notice of the alleged constitutional violation, it was incumbent on both

to determine whether Russell's belief was sincerely held and "*in his own scheme of*

*things*, religious."  *Ford*, 352 F.3d at 598 (internal quotation marks omitted).

Neither Pallito nor Menard made this inquiry into Russell's personal beliefs.

Instead, both consulted with other DOC officials and the food service provider.  (*See*

Doc. 134-2; Doc. 137-3 at 3, 5.)  Although Menard and Pallito could rely on these

opinions to some extent, an outside authorities' opinion "that a particular practice is

not religiously mandated under Muslim law, *without more*, cannot render [Pallito

and Menard's] conduct reasonable."  *Ford*, 352 F.3d at 598 (emphasis added).

Nothing in the current record suggests that either Menard or Pallito considered

additional information beyond these outside opinions, nor does anything in the

record suggest that either Menard or Pallito reasonably believed at the time "that

their conduct was justified by a legitimate penological interest."  *Id.* at 599

(remanding for lower court to consider the issue).  Accordingly, based on the

inferences drawn from this spare record and the well-established law in the Second

Circuit, a rational jury could find that Menard and Pallito acted in an objectively

unreasonable manner when they concluded that the prepackaged religious food

policy did not violate Russell's constitutional rights.

Based on the foregoing, Menard and Pallito's conclusory assertions provide no basis for granting qualified immunity. Of course, a more complete presentation of the defense at trial may establish otherwise.

## III.  Russell's Motion for Partial Summary Judgment

I now turn to Russell's Motion for Partial Summary Judgment. (Doc. 121.) Russell asserts the inverse of the argument advanced by Pallito; namely, that Russell's right to freely practice his religion has been substantially burdened by the DOC's prepackaged religious food policy and that Pallito has not advanced a legitimate penological purpose rationally related to the DOC's decision to serve prepackaged religious meals. (Doc. 121 at 3–4.)  Russell also claims that Pallito was personally involved in the decision to deny Russell a diet that conformed to his religious beliefs and that Pallito is not entitled to qualified immunity. (*Id.* at 4–5.) Given the unresolved factual disputes discussed in detail below, I recommend that Russell's Motion for Partial Summary Judgment be DENIED.

### A.  Free Exercise Claim

Although Russell's assertions and related evidence are sufficient for a rational jury to conclude that his sincerely held religious beliefs were substantially burdened, resolution of this discrete issue will not conclusively decide the merits of Russell's free exercise claim. Accordingly, I do not recommend entering partial summary judgment on this limited issue. Instead, concluding that unresolved factual disputes preclude summary judgment on the issue of whether the prepackaged religious meal policy is reasonably related to a legitimate penological

purpose, I find that summary judgment should not be granted on the merits of Russell's claim.

### 1. Substantial Burden on Russell's Sincerely Held Religious Beliefs

As set forth above, in order for the Court to grant partial summary judgment in Russell's favor, Russell must first establish (1) that he has a sincerely held religious belief, and (2) that this religious belief was substantially burdened. *Salahuddin*, 467 F.3d at 274. In arguing for summary judgment under the first prong, Russell asserts that he "need only demonstrate his beliefs are 'sincerely held' and in his 'own scheme of things, religious.'" (Doc. 121 at 3 (quoting *Ford*, 352 F.3d at 593).) And under the second prong, Russell contends that his understanding of the halal requirements is central to his faith and, accordingly, any infringement upon that belief represents a substantial burden. (*Id.*); *see McEachin*, 357 F.3d at 203 ("[T]o deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."). As described above, these assertions are supported by Russell's own deposition (*see* Doc. 134-5 at 4; *see also* Doc. 123-18 at 9–10), and by Dr. Fuerst's deposition, which provides evidence that Russell's beliefs fall within the norms of the Muslim faith. *Ford*, 352 F.3d at 594; (*see* Doc. 134-3 at 15–16, pp. 95–99).

In opposing Russell's Motion for Partial Summary Judgment, Pallito advances several arguments, none of which are sufficient to conclude that a genuine dispute exists as to whether Russell's sincerely held religious beliefs were substantially burdened. Pallito first states that Russell's "objections to the halal

diet [are] not religious in nature, but instead [are] improperly premised on [Russell's] preference." (Doc. 132 at 6.) Although Pallito is free to offer evidence at trial to demonstrate that Russell's assertion of his religious beliefs is motivated by "deception and fraud," *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d 153 at 157), no such evidence is present in the current record. Absent such evidence, Pallito's contention that Russell's claims are "not religious in nature" amounts to little more than a value-based judgment that Russell "did not comport with Islam's actual requirements." *Id.* (internal quotation marks omitted). Not only does all relevant precedent explicitly counsel against such a value-based conclusion, *see, e.g.*, *id.*; *Thomas*, 450 U.S. at 716, but also such a conclusory assertion is insufficient to defeat Russell's motion for partial summary judgment. *Singh v. Goord*, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) ("[D]efendants put forth no factual basis for this speculation [that plaintiff's beliefs are not sincere] and it is therefore insufficient to defeat plaintiff's motion for summary judgment.").

Next, Pallito again relies on the deposition of Imam Taysir Al-khatib, who posited that eating kosher food is halal and that, even if kosher food were not acceptable, a Muslim inmate has several alternatives to adhere to the requirements of halal. (Doc. 129 at 6–9.) But as stated above, this argument asks this Court "to distinguish important from unimportant religious beliefs, a task for which . . . courts are particularly ill-suited." *Ford*, 352 F.3d at 593. To reiterate, the relevant question in determining if a prisoner's beliefs were "substantially burdened" is whether a specific religious diet is of central importance to the *prisoner's* practice of the religion, not whether the practice is generally mandated by the relevant

45

religion.[11]  *Id.* at 593–94; *see also Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699, (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds*." (emphasis added)).  With regard to Imam Al-khatib's testimony, moreover, the Second Circuit has specifically held that the testimony of a religious expert on its own is not determinative of whether an inmate's beliefs have been substantially burdened.  *Ford*, 352 F.3d at 594. Accordingly, this Court declines Pallito's invitation to delve into ecclesiastical questions involving the halal requirements, and Russell's motion for partial summary judgment cannot be denied on this ground.  *See also McEachin*, 357 F.3d at 201.

Finally, Pallito argues that the prepackaged religious food policy was, at most, "a *de minimis* inconvenience."  (Doc. 132 at 10.)  Although "mere inconvenience to the [adherent] is insufficient to establish a substantial burden, demonstrating a substantial burden is not an onerous task for the plaintiff." *Singh*,

---

[11] As discussed above, Pallito also asserts that "the Court[s] in this circuit have clearly held that a Muslim inmate's free exercise of religion is not burdened by being served kosher meals," but this statement is not supported by the case law Pallito relies on.  (Doc. 132 at 8.)  To reiterate, unlike *Cox v. Kralik* and the other cases cited by Pallito, one of Russell's central claims is that, according to his sincerely held religious beliefs, kosher meals are *not* halal, a claim that is supported by Dr. Fuerst's expert deposition.  (*Compare* Doc. 134-3 at 9, p. 72; *id.* at 22, p. 156.), *with Cox*, 2006 WL 42122 (the plaintiff conceded that kosher meals did not violate his understanding of the Halal requirements);  *Smith v. Cty. of Nassau*, No. 12-CV-4344 (SJF)(GRB), 2014 WL 2862849, at *4 (E.D.N.Y. June 18, 2014) (granting summary judgment to defendant where "[p]laintiffs provide[d] no authority supporting their claim that the Kosher meals provided are unsuitable for Muslims"); *Walker v. Fischer*, No. 9:10-cv-01431 (MAD/DEP), 2012 WL 1029614, at *4 (N.D.N.Y. Mar. 26, 2012) (granting defendant's motion to dismiss where plaintiff conceded that "Kosher or Halal (permissible) Muslim meals" did not violate his religious beliefs); *McMichael v. Pallito*, Civil Action No. 1:09-CV-130, 2011 WL 6012173, at *5 (D. Vt. Oct. 24, 2011) (recommending summary judgment where "[n]either party has submitted evidence that would either establish or dispel the claim that Halal meats are a necessary part of a Muslim diet"), *report and recommendation adopted*, No. 1:09-cv-130-jgm-jmc, 2011 WL 6012091 (D. Vt. Dec. 1, 2011)).

520 F. Supp. 2d at 499 (alterations in original) (internal quotation marks and citation omitted). As stated above, the prepackaged religious food policy forced Russell either to abandon his strict halal requirements or to violate his beliefs. Moreover, in an attempt to follow his sincerely held interpretation of the halal requirements, Russell asserts that he stopped eating and that he ultimately lost 30 pounds. (Doc. at 134-1 at 19, ¶ 94.) Accordingly, admissible evidence supports an inference that Russell's sincerely held beliefs were substantially burdened and that the prepackaged religious food policy was not a mere inconvenience. *See McEachin*, 357 F.3d at 204; *Houston*, 2013 WL 4457375, at *8. Pallito points to nothing in the record suggesting that a genuine dispute exists as to these facts. Instead, Pallito repeats the same refrain: he questions the sincerity of Russell's religious beliefs and states that, because Russell "chose to abstain from eating certain items based on dissatisfaction with his meals and his own speculative conjecture," any burden was a *de minimis* inconvenience.[12]  (Doc. 132 at 9–10.)  This conclusory claim is not sufficient to defeat Russell's motion for partial summary judgment. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-

---

[12] Pallito also asserts that Russell's free exercise rights were not substantially burdened because prisons need not accommodate particularized religious dietary restrictions and that "inmates [are not] entitled to the amenities, conveniences and services of a hotel or to the food of their choice." (Doc. 132 at 7.)  This argument may be relevant under the third prong of a free exercise claim: that is, whether the relevant prison policy is reasonably related to legitimate penological concerns. *See, e.g., Baranowski v. Hart*, 486 F.3d 112, 120–22 (5th Cir. 2007) (applying the *Turner* factors and concluding that defendant's policy of not providing kosher meals was reasonably related to legitimate penological interest). But at this step in the analysis—analyzing whether or not an inmate's sincerely held beliefs have been substantially burdened—comparing hotel amenities to an inmate's constitutional right to freely exercise his or her religion is, at best, irreverent embellishment.  At worst, such an argument evinces a complete disregard for an inmate's right to practice his or her faith "unfettered by the state's definition of what constitutes a legitimate religious imperative." *McEachin*, 357 F.3d at 202.

moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

Given the above analysis, the undersigned Magistrate Judge could recommend granting summary judgment on the issue of whether Russell's sincerely held beliefs were substantially burdened. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.") But resolution of this discrete issue will not conclusively decide the merits of Russell's claim. Russell bears the burden of establishing that the prepackaged religious food policy "is not reasonably related to legitimate penological interests," *Guiffere*, 2007 WL 3046703, at *6, and, as discussed in detail below, genuine disputes of material fact exist as to this issue. Further, "[a]lthough Rule 56 allows a party to seek summary judgment on part of a claim, the reference to 'part' is best understood as relating to either the entirety of liability, or damages, or at least a discrete element of damages." *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 404 (E.D.N.Y. 2011) (citing *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 306–09 (E.D.N.Y. 2010)). Courts have thus employed Rule 56(g) as a means to "materially expedite the adjudicative process" or to "limit the scope of the trial by removing sham issues from the case." *Hartford Fire Ins. Co. v. Goodman Mfg. Co., L.P.*, No. 09 Civ. 10090(JSR), 2010 WL 3260111, at *2 (S.D.N.Y. Aug. 4, 2010) (internal quotation marks omitted). Neither concern is implicated here. As a

result, I do not recommend entry of partial summary judgment. *Cf.* Fed. R. Civ. P. 56(g). Rather, Russell must satisfy his burden of proof at trial.

## 2.    Legitimate Penological Interests

In contrast to the above analysis, viewing the record in the light most favorable to Pallito, the evidence establishes a genuine dispute of material fact as to whether the legitimate penological concerns articulated by Pallito were rationally related to the prepackaged religious food policy. Therefore, summary judgment is not appropriate on this issue.

As discussed in detail above, after an inmate has established that his or her sincerely held religious belief has been substantially burdened, the Court must balance the inmate's right to freely exercise his or her religion against the legitimate penological concerns articulated by prison officials for the purportedly unconstitutional policy. *Guiffere*, 2007 WL 3046703, at *6. This inquiry into the reasonableness of the policy is governed by the four factors set forth by the U.S. Supreme Court in *Turner v. Safley*, 482 U.S. 78 and is generally ill-suited for resolution on a summary judgment motion.[13] *See Marria*, 200 F. Supp. 2d at 297; *Show*, 955 F. Supp. at 190–91. Ultimately, if the particular policy is rationally

---

[13] As set forth above, those four factors include:

1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin*, 905 F.2d at 574 (citing *Turner*, 482 U.S. at 89–90)).

related to a legitimate penological interest, the policy does not unconstitutionally abridge an inmate's rights. *Turner*, 482 U.S. at 93.

Under the first *Turner* factor, Russell argues that "there is no legitimate penological interest at play here" and correctly observes that the post hoc financial justification asserted by Pallito cannot be rationally related to the prepackaged religious meal policy because the DOC did not implement the policy with the expectation that it would save money. (Doc. 121 at 4); *see Salahuddin*, 467 F.3d at 277 ("Post hoc justifications with no record support will not suffice."). With regard to the other penological interests advanced by Pallito—security and cross-contamination concerns[14] (Doc. 132 at 12–13)—Russell argues that summary judgment should be granted because these concerns are irrational. (Doc. 136 at 8.) In particular, Russell asserts that jealousy among inmates over the food options amounts to a speculative security concern and further claims that "the goal of preventing cross-contamination of halal food is not furthered by denying Muslim inmates a halal diet." (*Id.*) As noted above, scant evidence in the record establishes that the prepackaged religious meal plan was motivated by these specific penological concerns at the time it was implemented, *cf. Salahuddin*, 467 F.3d at 276; nevertheless, viewing the evidence in the light most favorable to Pallito, the statements in Arnell's deposition provide sufficient evidence to defeat entry of

---

[14] In Pallito's response opposing Russell's Motion for Partial Summary Judgment, Pallito again argues that security concerns arose "in part . . . [from] abuse of the diet by other inmates, where inmates who were not truly Muslim were identifying the Muslim faith as their religion and requesting the diet." (Doc. 132 at 12.) The Court does not credit this argument for the reasons described above; in particular, that such a penological interest invites DOC officials to impermissibly "judge the significance of particular devotional obligations to an observant practitioner of faith." *McEachin*, 357 F.3d at 201.

summary judgment. (*See* Doc. at 123-12 at 6 (stating that "a separate meal program can create jealousy" and that "there could be cross-contamination and things that occur within the secure environment that make it difficult to control")). Further, administrative concerns as well as security concerns are legitimate penological interests. *See Marria*, 200 F. Supp. 2d at 294 ("[T]here is no question that prison safety and security are legitimate . . . penological interests."); *O'Lone*, 482 U.S. at 346 (finding a legitimate penological interest where "[e]vidence showed . . . administrative burdens that prison officials found unacceptable."). Accordingly, sufficient evidence exists to raise a genuine dispute as to a material fact.[15] Put another way, "the matter is not so free of doubt as to permit summary judgment at this time." *Schwartzbord v. United States*, 575 F. Supp. 1560, 1561 (S.D.N.Y. 1983).

With respect to the three remaining *Turner* factors, because Russell has failed to make any argument relating to these factors (*see generally* Docs. 121, 136), Russell has not satisfied his initial burden. *See Salahuddin*, 993 F.2d at 309. And in any event, viewing the record in the light most favorable to Pallito, significant facts preclude summary judgment in Russell's favor. For example, under the third *Turner* factor, the Court must assess "the impact that accommodation of the right

---

[15] As discussed in the preceding sections, in viewing the record under the opposite presumption—that is, in the light most favorable to Russell—this Court reached a different conclusion, determining that Arnell's deposition was not sufficient for Menard and Pallito to "close the circle" and establish that the prepackaged religious meal plan was motivated by specific penological concerns at the time it was implemented. *Salahuddin*, 467 F.3d at 277. To put it plainly, neither party has submitted sufficient evidence to establish that no genuine dispute of material fact exists; accordingly, this Court can neither deny nor conclude as a matter of law that there was a rational relationship between the regulation and the legitimate government interests asserted.

will have on the prison system." *Benjamin*, 905 F.2d at 574 (citing *Turner*, 482 U.S. at 89–90).  Given that the switch to the prepackaged meal policy saved the DOC approximately $260,000, it is reasonable to infer that eliminating the new policy to accommodate Russell's religious beliefs would adversely affect the DOC's finances.[16] Similarly, Pallito has suggested that Russell could receive halal compliant and nutritionally adequate meals by eating as a vegetarian[17] (Doc. 132 at 13), while Russell has stated that this suggested alternative diet is not nutritionally adequate. (Doc. 134 at 8.)  Neither party has submitted evidence to either establish or dispel the claim that the vegetarian meal options were nutritionally adequate alternatives.  Accordingly, I cannot address the second and fourth *Turner* factors at the summary judgment stage.

In sum, under the first *Turner* factor, Russell and Pallito plainly dispute the legitimacy of the penological interests as well as the rational connection between those interests and the prepackaged meal policy.  And the remaining three *Turner* factors raise additional material disputes that cannot be resolved by the current record.  Because the record is insufficient to resolve these disputes in favor of either party as a matter of law, the issue must be resolved by the trier of fact.

---

[16]  Although the cost savings of the prepackaged meal policy are not a legitimate justification for the initial implementation of the policy, the financial costs of abolishing the current religious food policy and accommodating Russell's beliefs are relevant to the inquiry.  *See Benjamin*, 905 F.2d at 574.

[17]  The other alternatives advanced by Pallito—that Russell could have either recited the *basmala* prior to eating the prepackaged meals or practiced *wara'* (Doc. 132 at 13)—rest on a specific interpretation of halal, an interpretation not necessarily embraced by all practicing Muslims.  (*See* Doc. 134-3 at 9, p. 72.)  To reiterate, this Court declines to interpret a dispute regarding doctrine for purposes of summary judgment.  *Thomas*, 450 U.S. at 716; *Marria,* 200 F. Supp. 2d at 295 (declining to exercise summary judgment based on the DOC's "seemingly value-based argument").

52

## B.     Personal Involvement

The Court next turns to Russell's argument that Pallito was personally involved in the decision to deny Russell a proper religious diet.  (Doc. 121 at 6.)  As this Court concluded above, when viewed in the light most favorable to Russell, the facts are sufficient for a reasonable jury to conclude that Pallito was personally involved.  But those facts are disputed and, when viewed under the opposite presumption—in the light most favorable to Pallito—a rational jury could conclude that Pallito was not personally involved.  Accordingly, this issue is not appropriate for summary judgment.

Russell argues in his motion for partial summary judgment that Pallito, "[a]s the final decision maker in the inmate grievance process, . . . was made aware of the constitutional violation, but declined to take any action."[18]  (Doc. 121 at 5.)  Russell is correct that a supervisor may be personally involved if the supervisor failed to remedy a wrong after being informed through a report or appeal.  *Hernandez*, 341 F.3d at 145.  But this is a factually complex inquiry which depends on the supervisor's familiarity with the nature of the prisoner's grievance and whether the supervisor personally acted upon the grievance.  *Cabassa*, 2013 WL 1183296, at *8; *see also Williams*, 781 F.2d at 323.  Thus, a supervisor who merely forwards a

---

[18]  As a reminder, a supervisor may be liable where there was:

(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez*, 341 F.3d at 145 (citing *Colon*, 58 F.3d at 873).

grievance letter to the appropriate subordinates is not personally involved, *see Ramos,* 2001 WL 840131 at *8, while a supervisor who "acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint" may be liable under § 1983. *Wright*, 234 F. Supp. 2d at 363.

Russell points to the grievance denial letter signed by Pallito as evidence of Pallito's sufficient familiarity with Russell's constitutional allegations. (*See* Doc. 121 at 6; Doc. 134-2.) But a rational jury could draw the opposite inference. In particular, Pallito wrote in the letter that he denied Russell's appeal after consulting with a DOC administrative official and the DOC food services vendor. (Doc. 134-2.) Viewing this statement in the light most favorable to Pallito, it may be inferred that Pallito merely forwarded Russell's grievance letter to the appropriate subordinates for investigation and subsequently relied on the subordinates' recommendation to deny Russell's grievance. *See Ramos*, 2001 WL 840131 at *8. This evidence may not be conclusive at trial and, aside from the letter's language, nothing in the record corroborates the inference that Pallito merely forwarded the letter to the appropriate subordinates. But at this stage in the proceedings "the matter is not so free of doubt as to permit summary judgment." *Schwartzbord*, 575 F. Supp. at 1561. Accordingly, Russell is not entitled to judgment as a matter of law on this issue.

## C.    Qualified Immunity

Finally, the Court briefly addresses Russell's contention that Pallito cannot be shielded by qualified immunity. (Doc. 121 at 4–5.) Because "[q]ualified immunity is an affirmative defense[,] [t]he burden rests on the defendants . . . to

establish the defense on a motion for summary judgment or at trial." *Lee v. Sandberg*, 136 F.3d 94, 101 (2d Cir. 1997) (citing *In re State Police Litig.*, 88 F.3d at 123). As discussed above, I have concluded that Pallito has not, as of yet, satisfied this burden because the issue has been inadequately briefed. But Russell is not entitled to summary judgment on the issue.

## IV.    Mason and Bilodeau's Motion for Summary Judgment

The Court next turns to Mason and Bilodeau's Motion for Summary Judgment. (Doc. 128.) For the reasons set forth below, I recommend that their Motion for Summary Judgment be GRANTED.

### A.    Procedural Due Process Claims Against Bilodeau

In his Second Amended Complaint, Russell alleges that his due process rights were violated during two separate disciplinary hearings adjudicated by Bilodeau. At the first hearing, Russell claims that Bilodeau failed to consider evidence showing Russell's innocence (Doc. 61 at 15, ¶¶ 81, 82); and, at the second hearing, Russell claims that Bilodeau was not an impartial factfinder, as required by the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 83, 84.) "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alteration in original) (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)); *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam) (emphasis omitted) (stating plaintiff had "[n]o right to due process [at his hearing] unless a liberty interest" was infringed as a result). Below, each prong is examined in relation to the relevant facts.

### 1.    Liberty Interest

Under the first prong, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In determining whether a prisoner's placement in solitary confinement amounts to an "atypical and significant hardship," the Court must consider the duration of the solitary confinement in relation to the conditions of confinement. *See Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (citation omitted) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."). By advising courts to balance these concerns, the Second Circuit has generally "avoided a bright line rule that a certain period of [segregated] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004); *compare Sealey*, 197 F.3d at 589 (holding inmate's confinement for a 101-day period under conditions that were "somewhat more severe than those of general population" did not implicate a liberty interest), *with Palmer*, 364 F.3d at 66 (concluding prisoner's solitary confinement for 77 days under unusually harsh conditions raised a question of fact sufficient to survive summary judgment). With respect to summary judgment, however, if the record lacks detailed facts, the Second Circuit has "affirmed dismissal of due process claims . . . in cases where the period of time spent in [solitary confinement] was exceedingly short . . . and there was no indication that the plaintiff endured unusual [solitary] conditions." *Palmer*,

364 F.3d at 65–66 (citing *Hynes v. Squillace*, 143 F.3d 653, 658–59 (2d Cir. 1998) (per curiam) (concluding 21 days in keeplock did not implicate liberty interest)); *see also Arce v. Walker*, 139 F.3d 329, 335–36 (2d Cir. 1998) (determining that 18 days in solitary did not raise liberty interest); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (holding that 12 days in solitary did not implicate liberty interest).

That is the situation here, where two periods of brief solitary confinement are at issue. In the first, Russell was confined for five days in disciplinary segregation in October 2014 for "lying to a correctional officer." (Doc. 128-26 at 2, ¶¶ 4, 5.) In the second period, Russell was segregated for 12 days in August 2015 for "a planned assault on another inmate." (*Id.* ¶¶ 4, 6.) Nothing in Russell's Second Amended Complaint suggests that his placement in solitary confinement was unusually harsh (*see generally* Doc. 61) and, further, the only relevant evidence in the record indicates that Russell's conditions of solitary confinement did not differ from the conditions experienced by other inmates. (Doc. 128-26 at 3, ¶ 7.) Given the absence of a detailed factual record and the short duration of Russell's solitary confinement, the undisputed facts establish that Russell did not possess a protected liberty interest.

Indeed, Russell concedes in his Opposition to the Summary Judgment Motion to Dismiss that "no protected liberty interest is at stake where [he] was placed in administrative segregation for just 17 days, and conditions of confinement do not present an 'atypical and significant hardship.'" (Doc. 138 at 9.) Russell instead argues that "[t]he liberty interest at stake here is the First Amendment right to be

free from retaliation." (*Id.*) As an initial matter, a prisoner's Fourteenth Amendment right to due process of the law is distinct from a prisoner's First Amendment right to be free from retaliation for filing a grievance. *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("While a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, he has a right not to be subjected to false misconduct charges in retaliation for his exercise of a constitutional right." (citation and internal quotation marks omitted)). Further, Russell's arguments regarding the legal basis for his claims against Bilodeau are contradicted by his Second Amended Complaint, which asserts that "[b]y refusing to afford Mr. Russell an opportunity to submit to a simple allergy test, . . . Bilodeau denied Mr. Russell *due process of law*." (Doc. 61 at 15, ¶ 82 (emphasis added).) Similarly, the Second Amended Complaint contends that Bilodeau was incapable of serving as an impartial factfinder and, further, that "'[t]he right to *procedural due process* requires an impartial fact[]finder." (*Id.* ¶¶ 82, 83 (emphasis added).) Plainly, the substance of Russell's allegations against Bilodeau involve the alleged violation of Russell's due process rights.[19] As discussed above, however, the facts establish that Russell did not possess a protected liberty interest.

Accordingly, Bilodeau is entitled to summary judgment on the first prong.

---

[19] Although Russell plainly pursues a due process claim against Bilodeau, the Court briefly considers Russell's asserted retaliation claim below.

### 2. Insufficient Process

Moreover, even if Russell could establish a protected liberty interest, the undisputed facts demonstrate that Russell received sufficient due process at both disciplinary hearings.

As a general matter, an inmate is entitled to the following procedural safeguards before being deprived of a constitutionally cognizable liberty interest:

> (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense.

*Shabazz v. Bezio*, No. 9:10-CV-1212 (NAM/DEP), 2014 WL 4794432, at *12 (N.D.N.Y. Sept. 25, 2014) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564–69 (1974), *aff'd*, 669 F. App'x 592 (2d Cir. 2016); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). Further, "[t]o pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least 'some evidence.'" *Shabazz*, 2014 WL 4794432, at *12 (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985)). In interpreting this standard, the Second Circuit has "looked to see whether there was 'reliable evidence' of the inmate's guilt." *Luna*, 356 F.3d at 488; *see also Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001); *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the

record that could support the conclusion reached by the disciplinary board." *Luna*, 356 F.3d at 488 (quoting *Hill*, 472 U.S. at 455–56.) "This standard is extremely tolerant." *Johnson v. Goord*, 305 F. App'x 815, 817 (2d Cir. 2009) (quoting *Hill*, 472 U.S. at 455).

With regard to the first disciplinary hearing, Russell asserts that he was denied due process because Bilodeau failed to afford Russell an opportunity to submit a simple allergy test demonstrating that he was, in fact, allergic to peanuts.[20]  (Doc. 61 at 15, ¶ 82.)  But this argument does not address the nature of the evidence that Bilodeau considered in finding Russell guilty.  As noted above, when Russell met with Mason to resolve his grievance (*id.* at 5–6, ¶ 24), Russell informed Mason that he could not eat the bagged lunch because he was allergic to the peanuts in the peanut butter and jelly sandwich.  (*Id.* at 6, ¶ 26.)  Subsequently, after Mason confirmed with NSCF medical authorities that "there [was] no record of Russell being allergic to peanuts," she reported Russell for a disciplinary infraction. (Doc. 128-6 at 2; *see also* Doc. 128-31.)

During the following disciplinary hearing, Bilodeau relied on Mason's report, as well as the records of the NSCF medical personnel.  (Doc. 128-11 at 2.)  Bilodeau noted that Russell had not declared that he was allergic to peanuts in his intake

---

[20]  Mason and Bilodeau argue that, with respect to Russell's request to undergo an allergy test, Russell failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act.  (Doc. 128 at 14–15.)  But the record indicates that Russell sought review of his failure to inform medical authorities of his peanut allergy.  (*See* Doc. 128-34 at 3.)  Given that satisfying the exhaustion requirement is not a heavy burden, *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012), Russell's grievance appeal was enough to notify officials as "to the nature of the claim" and to "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (internal quotation marks omitted).

form at NSCF, writing that Russell claimed to be allergic to peanuts without "mention[ing] being allergic to peanuts during [his] intake at this facility." (*Id.* at 3.) Given the discrepancies between Russell's statements to Mason and the DOC records, Bilodeau found Russell guilty of "[g]iving false information," which prohibits inmates from "intentionally misleading staff in the course of their official duty." (*Id.*; *see also* Doc. 138-14 at 20.) Bilodeau's decision was upheld in an administrative appeal. (Doc. 128-34.) Based on the evidence reviewed by Bilodeau, which is uncontroverted by Russell, there is at least some admissible evidence in the disciplinary record to show that Russell provided false information to DOC staff, regardless of whether an allergy test was administered. *See Wright v. Esgrow*, No. 10-CV-6502 CJS, 2013 WL 1826053, at *10 (W.D.N.Y. Apr. 30, 2013) (finding no procedural due process violation based on record, despite "significant exculpatory evidence that supported [inmate's] claim of innocence"). Accordingly, Bilodeau has established as a matter of law that he did not violate Russell's due process rights for failing to provide an allergy test to Russell.

Russell next argues that he was denied due process in a second disciplinary hearing conducted by Bilodeau. Specifically, Russell claims that, because Bilodeau had been named as a defendant in the present suit, Bilodeau was incapable of serving as an impartial factfinder in the disciplinary hearing. (Doc. 61 at 15, ¶¶ 83, 84.) It is true that due process requires that prison disciplinary hearings be conducted by a "fair and impartial hearing officer." *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999). But "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Francis v.*

*Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). "Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Id.* For this reason, "[p]rison officials enjoy a rebuttable presumption that they are unbiased." *Moore v. Griffin*, No. 9:13-CV-616 (FJS/TWD), 2015 WL 5330366, at *10 (N.D.N.Y. Sept. 11, 2015) (internal quotation marks omitted). "A hearing officer may satisfy the standard of impartiality if there is some evidence in the record to support the findings of the hearing." *Fernandez v. Callens*, No. 06–CV–0506(Sr), 2010 WL 4320362, at *12 (W.D.N.Y. Oct. 29, 2010) (internal quotation marks omitted).

The second incident leading to Russell's confinement in segregation occurred after Russell filed the present lawsuit on June 12, 2015. (*See* Doc. 1.) In July 2015, Russell was charged with attempted assault based on a phone conversation with a former inmate. (Doc. 128-19.) In the conversation, the former inmate appeared to instruct Russell to assault another prisoner, and Russell agreed to "handle it." (*Id.*; *see also* Doc. 128-20.) Bilodeau oversaw the disciplinary hearing in the matter and ultimately sanctioned Russell to 12 days in disciplinary segregation. (Doc. 128-23 at 3.) In reaching his decision, Bilodeau reviewed the reports of two correctional officers, both of whom described Russell's phone conversation with the former inmate. (*See* Doc. 128-19; Doc. 128-20; Doc. 128-23 at 3.) As a result, "some evidence in the record" supports Bilodeau's decision. *See Fernandez,* 2010 WL 4320362, at *12.

Moreover, Russell has not alleged that Bilodeau predetermined Russell's guilt, nor does he point to any evidence suggesting that Bilodeau prejudged the disposition of the disciplinary hearing. *See Francis*, 891 F.2d at 46 ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard."). Similarly, Russell does not allege that Bilodeau was actually biased, nor does he point to any evidence of Bilodeau's actual bias. *Id.* Instead, Russell's claim rests entirely on the supposition that Bilodeau is presumptively biased merely because he was sued by Bilodeau. (Doc. 61 at 15, ¶ 84.) Given that "[p]rison officials enjoy a rebuttable presumption that they are unbiased," *Moore*, 2015 WL 5330366, at *10 (internal quotation marks omitted), Russell's bare allegation of bias, without more, is insufficient to defeat the motion for summary judgment. *Id.*

Concluding that Russell has not established a genuine dispute of fact as to either prong of a procedural due process claim, Bilodeau is entitled to summary judgment.

## B.  Retaliation Claims Against Mason and Bilodeau

Reference is now made to the retaliation claims Russell brings against Mason and Bilodeau. As explained below, Russell presents no evidence that he would not have received the same punishment absent Mason's purportedly retaliatory motives; as a result, Mason is entitled to summary judgment on this issue. Further, Russell's Second Amended Complaint fails to raise a retaliation claim against Bilodeau.

The First Amendment guarantees the right to petition for redress of grievances without fear of reprisal. *See United Mine Workers of Am. v. Ill. State*

*Bar Ass'n*, 389 U.S. 217, 222 (1967); *King v. McIntyre*, No. 9:11-CV-1457, 2015 WL 1781256, at \*4 (N.D.N.Y. Apr. 8, 2015) ("Claims of retaliation find their roots in the First Amendment."). A plaintiff alleging retaliatory punishment must show that:

> (1) the speech or conduct at issue was protected; (2) the defendants took adverse action against the plaintiff namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a substantial or motivating factor in the defendants' decision to take action against the plaintiff.

*King*, 2015 WL 1781256, at \*4 (internal quotation marks omitted); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002). "The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation." *Gayle*, 313 F.3d at 682. "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.'" *Id.* (quoting *Hynes*, 143 F.3d at 657). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks omitted). With this legal framework in mind, I turn to Russell's retaliation claims, bearing in mind that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* (internal quotation marks omitted).

### 1. Retaliation Claims Against Mason

In his Second Amended Complaint, Russell alleges that, after he filed an administrative grievance against Mason, she unconstitutionally retaliated (1) by filing disciplinary charges against him and (2) by tampering with his food.  (Doc. 138 at 10; Doc. 61 at 5–6, ¶¶ 23–28.)  Mason seeks summary judgment on both claims, asserting that she would have filed the disciplinary report in the absence of any retaliatory motive.  (Doc. 128 at 7.)

### a. Disciplinary Charges

As Mason acknowledges, a prisoner who files a grievance is protected by the First and Fourteenth Amendments (*id.* at 19); thus, no dispute exists that Russell engaged in constitutionally protected conduct when he filed the grievance against Mason.  *See Gayle*, 313 F.3d at 682.  It is equally plain that filing a purportedly false disciplinary report constitutes an adverse action, in that such an action would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.  *See id.*; *King*, 2015 WL 1781256, at *5.  Finally, viewing the record in the light most favorable to Russell, a causal connection existed between the grievance filed by Russell and Mason's subsequent disciplinary report.  Specifically, Mason filed the disciplinary report in direct response to the purportedly false allergy information Russell provided during their meeting.  (Doc. 138-2 at 4, ¶¶ 12–13); *see Gayle*, 313 F.3d at 683 ("[T]emporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation.").  Accordingly, viewing the record in the light most

favorable to Russell, he has advanced sufficient proof to defeat summary judgment as to his initial burden.

But Russell does not provide any evidence demonstrating that he did not commit the conduct charged in Mason's disciplinary report. *Gayle*, 313 F.3d at 682. As noted above, at the disciplinary hearing, Bilodeau noted that Russell had not declared that he was allergic to peanuts in his intake form at NSCF, writing that Russell claimed to be allergic to peanuts without "mention[ing] being allergic to peanuts during [his] intake at this facility." (Doc. 128-11 at 3.) As a result, Bilodeau sanctioned Russell for "[g]iving false information" in violation of Directive No. 410.01, Major A #11, which prohibits inmates from "intentionally misleading staff in the course of their official duty." (Doc. 128-11 at 3; *see also* Doc. 138-14 at 20.) Russell administratively appealed Bilodeau's decision, arguing in his appeal that he "was giv[en] a major for not letting medical [know] I had a peanut allerg[y]." (Doc. 128-34 at 3.) But Russell's conviction was upheld on administrative appeal, with the Superintendent writing that "to this day [NSCF] medical [staff] still hasn't received confirmation that you are allergic to peanuts. This is the false info you were convicted of." (*See id.* at 2.) Accordingly, Russell's disciplinary finding was based on his statement to Mason regarding his allergy to peanuts, which at the time had not been ascertained by the DOC medical staff. Indeed, in his sworn affidavit, Russell states that his disciplinary finding was based on his statements to Mason (Doc. 138-2 at 4, ¶ 14), and concedes that he did not reveal his peanut allergy to the NSCF medical staff. (*Id.* ¶ 9.) Given Russell's concession that his statement to

Mason could not be corroborated by the NSCF medical staff,[21] there is no dispute that Russell committed the prohibited conduct charged in the misbehavior report. *See King*, 2015 WL 1781256, at *6 (granting summary judgment where plaintiff conceded that he was guilty of the two most serious charges in the misbehavior report). Because Russell would have received the same punishment even absent Mason's allegedly retaliatory motivation, *Gayle*, 313 F.3d at 682, Mason has established as a matter of law that she did not file false disciplinary charges in retaliation for Russell filing his grievance.

### b.    Tampering with Food

Russell also claims that, after he filed his grievance against Mason, he "repeatedly found foreign objects in his food, including large pieces of plastic, tin foil, and hair" (Doc. 61 at 7, ¶ 33), and that, on three days of Ramadan—July 1, 2, and 7, 2015—he received food trays containing peanut butter. (*Id.* at 10, ¶¶ 49, 51.) Again, no factual dispute exists as to the first prong of a retaliation claim; Russell engaged in constitutionally protected conduct when he filed his grievance against Mason and when Russell brought the present lawsuit. *See Gayle*, 313 F.3d at 682. Under the second prong, however, the isolated incidents described by Russell do not

---

[21] Russell argues that the medical staff at NSCF failed to "verify" his peanut allergy (Doc. 138 at 5); but Directive 354.05, which was in force at the time and governed alternative diets for inmates, did not require DOC medical personnel to verify the allergy of an inmate. (*See* Doc. 138-7.) Rather, Directive 354.05(1)(ii) stated that "a qualified health care professional will attempt to verify the allergy of any inmates claiming food allergies before the medical diet is ordered" and subsection (1)(vii) required that an inmate "[p]rovide needed information to help verify the stated food allergy." (*Id.* at 3–4.) In this case, the record conclusively establishes that, on March 12, 2015, medical personnel at NSCF examined Russell and found that "[c]linical presentation does not seem to suggest any sign of respiratory distress or allergic reaction at this time." (Doc. 128-37 at 3.) Further, Russell did not provide any independent verification of his peanut allergy. (Doc. 128-34 at 2, ¶ 7.) Accordingly, the NSCF medical personnel complied with Directive 354.05.

constitute an adverse action because "prisoners may be required to tolerate more . . . than average citizens, before a retaliatory action taken against them is considered adverse." *Rembert v. Cheverko*, No. 12-CV-9196 (KBF), 2014 WL 3384629, at *9 (S.D.N.Y. July 10, 2014) (internal quotation marks omitted); *see also Mateo v. Heath*, No. 11 Civ. 636(LAP), 2012 WL 1075836, at *4 (S.D.N.Y. Mar. 29, 2012) (concluding a "single denial of visitation, even if intentional and unjustified, is nevertheless unlikely to chill a person of ordinary firmness from continuing to exercise his right to file grievances"); *Ross v. Westchester Cty. Jail*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) (concluding allegations of irregular incidents of harassment did not constitute adverse action).  With respect to the incidents during Ramadan, moreover, these incidents were unlikely to dissuade a person of ordinary firmness from exercising his or her constitutional rights because, as Russell concedes, on the occasions that he incorrectly received peanut butter as part of his Ramadan meal, he eventually received a meal that did not contain peanut butter.  (Doc. 138 at 7; *see also* Doc. 138-18; Doc. 128-16 at 3, ¶¶ 6, 7).

Further, even if these isolated incidents constituted adverse actions, nothing in the record establishes a causal connection between these incidents and Russell's protected speech.  Although Russell alleges that Mason "arranged for kitchen staff to tamper with [his] meals in retaliation for the grievance he had filed against her" (Doc. 61 at 7, ¶ 34), he has offered no evidence to bolster these conclusory claims. *Cf. D'Amico*, 132 F.3d at 149 ("The non-moving party may not rely on mere conclusory allegations nor speculation.").  Instead, the evidence in the record leads

to the opposite conclusion: Mason states in a sworn affidavit that her duties did not involve the preparation of food or delivering food to inmates, suggesting that she had no connection to the incidents.  (Doc. 128-16 at 2, ¶¶ 3, 4.)  Finally, at least some of the protected activity was not close in time to the purportedly adverse actions.  For example, Russell sets forth no time frame for the incidents involving foreign objects in his food; accordingly, the Court is unable to establish the existence of causal relationship based on these incidents.[22]  *See Baskerville*, 224 F. Supp. 2d at 732.  In short, even if the Court assumes that the incidents described by Russell occurred, the infrequent incidents do not rise to the level of a constitutional violation, nor does Russell point to any evidence in the record that establishes a causal connection between Mason and some of the isolated events.

Accordingly, Mason is entitled to summary judgment on this issue.

### 2.    Retaliation Claims Against Bilodeau

Reference is now made to Russell's assertion in his Opposition to the Motion for Summary Judgment that Bilodeau retaliated against Russell by presiding over Russell's second disciplinary hearing as an impartial adjudicator.  (Doc. 138 at 11.)  As discussed above, however, Russell did not raise any retaliation claims against Bilodeau in his Second Amended Complaint.  (*See generally* Doc. 61.)  Instead,

---

[22] Although unclear from Russell's Second Amended Complaint, it appears that he alleges that the Ramadan incidents in July 2015 occurred after Russell filed the present suit against Mason on June 12, 2015.  (*See* Doc. 61 at 10, ¶¶ 48–51.)  Accordingly, some temporal evidence circumstantially connects the alleged retaliatory events on Ramadan to the present suit filed by Russell.  *See Gayle*, 313 F.3d at 683.  As noted above, however, on the occasions that Russell incorrectly received peanut butter as part of his Ramadan meal, he eventually received a meal that did not contain peanut butter.  (Doc. 138 at 7; *see also* Doc. 138-18; Doc. 128-16 at 3, ¶¶ 6, 7.)  Accordingly, those isolated incidents did not amount to an adverse action.  *Ross*, 2012 WL 86467, at *7 (concluding allegations of irregular incidents of harassment did not constitute adverse action).

Russell claimed that Bilodeau denied him due process of the law.  (Doc. 61 at 15,

¶¶ 82–84.)  Given Russell's failure to state a retaliation claim against Bilodeau,

Russell is required to seek leave to amend his Second Amended Complaint under

Federal Rule of Civil Procedure 15(a).[23]

## V.     Russell's Renewed Motion to Certify Class Action

Russell renews his motion seeking class certification with respect to his claim

that the DOC's prepackaged religious food policy violated his right to freely exercise

his religion.  (Doc. 141; *see also* Doc. 41.)  In his original motion for class

certification, Russell sought to be named class representative of "a prospective class

of Muslim inmates, now or formerly in the custody of the Vermont Department of

Corrections, who were denied Halal meals pursuant to policies enacted, or

permitted to continue in existence, by Defendants Pallito and Menard."  (Doc. 41

at 1.)  In his renewed motion, Russell more narrowly defines the class, asserting

that the "proposed class consists of all Muslim inmates within the custody of DOC

who were offered prepackaged kosher meals, from when DOC first began serving

those meals in late 2014, to the present, who consider the content of those meals to

---

[23] Moreover, at least on the record currently before the Court, such an amendment would be futile.  The basis of Russell's retaliation claim against Bilodeau is that, after Russell filed the present law suit, Bilodeau presided over a disciplinary hearing in which he ultimately sanctioned Russell to 12 days in disciplinary segregation for attempted assault.  (Doc. 128-23 at 3.)  Russell claims that Bilodeau retaliated against Russell because Bilodeau rejected Russell's request for Bilodeau to recuse himself from the hearing.  (Doc. 138 at 11.)  But, even if Russell satisfied "his burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in [Bilodeau's] decision to discipline [Russell]," Russell does not dispute that he "would have received the same punishment even absent the retaliatory motivation," precluding any retaliation claim against Bilodeau.  *Gayle*, 313 F.3d at 682.  Accordingly, any request to amend the complaint would be futile.  *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("Although Fed. R. Civ. P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

be in conflict with their sincerely held religious dietary beliefs." (Doc. 141 at 2.) As set forth below, Russell has failed to satisfy his burden because the nature of Russell's claim would require inquiry into the individualized factual circumstances of each class member; accordingly, I recommend that the Court DENY certification of the proposed class.

## A.    Legal Standard

Because the class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979), "[a] party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard."). Russell, as the party seeking certification, "bears the burden of establishing the existence of all four Rule 23(a) requirements, often referred to as the criteria of 'numerosity, commonality, typicality, and adequacy.'" *Bourlas v. Davis Law Assocs.*, 237 F.R.D. 345, 350 (E.D.N.Y. 2006); *see also* Fed. R. Civ. P. 23(a).[24] If Russell satisfies this burden, he must also establish that his proposed class action is one of the three types of class action suits identified in

---

[24] Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b).[25]  *See Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 117 (2d Cir. 2013).  Finally, where the party seeks to maintain the class under Rule 23(b)(3), as Russell does here,[26] the party must satisfy the implicit requirement that the class is ascertainable; that is,

---

[25]  Rule 23(b) states:

(b) Types of Class Actions.  A class action may be maintained if Rule 23(a) is satisfied and if:

    (1) prosecuting separate actions by or against individual class members would create a risk of:

        (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

        (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

    (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

[26]  Ascertainability "is a judicial creation meant to ensure that class definitions are workable when members of the class will be entitled to damages or require notice for another reason"; accordingly, courts generally require a class action seeking damages under Rule 23(b)(3) to satisfy the implicit requirement that the class is ascertainable.  *See Floyd v. City of New York*, 283 F.R.D. 153, 171 (S.D.N.Y. 2012).  By contrast, a party seeking declaratory or injunctive relief under Rule 23(b)(2) need not demonstrate ascertainability "because the essence of a (b)(2) class is that it is cohesive and homogeneous without meaningful divergent interests among the members of the class." 1 McLaughlin on Class Actions § 5:15 (15th ed.) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359–60 (2011)); *see also Floyd*, 283 F.R.D. at 172 ("It would be illogical to require precise ascertainability in a suit that seeks no class damages."); *Daniels v. City of New York*, 198 F.R.D. 409, 416 (S.D.N.Y. 2001) ("[G]eneral class descriptions based on the harm allegedly suffered by plaintiffs [are] acceptable in class actions seeking only declaratory and injunctive relief under Rule 23(b)(2)." (alteration in original) (internal quotation marks omitted)).  In this case, although Russell's Second Amended Complaint seeks money damages, injunctive relief, and a declaratory judgment on behalf of the proposed class (Doc. 61 at 12–13, ¶¶ 65–73), his written submissions seeking class certification neither present arguments relating to a (b)(2) class, nor point to specific evidence in relation to a (b)(2) class.  (*See generally* Doc. 41; Doc. 141.)  Given that Russell bears the burden of establishing the class requirements by a preponderance of the evidence, this Court reviews his motion to certify class under the standards applicable to (b)(3), including the implicit requirement of ascertainability.

the class must be "precise, objective[,] and presently ascertainable." *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) (internal quotation marks omitted).

To determine whether each Rule 23 requirement has been met, the court must undertake a rigorous analysis and assess all of the relevant evidence admitted at the class certification stage. *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 262 (D. Vt. 2011). A plaintiff must meet each Rule 23 requirement by offering "significant proof"; accordingly, "[w]here significant proof is lacking, class certification should be denied." *Id.* (internal quotation marks omitted.) To satisfy this standard, the court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id.* (internal quotation marks omitted). Ultimately, the court must "make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, . . . must resolve material factual disputes relevant to each Rule 23 requirement," and must find that each requirement is "established by at least a preponderance of the evidence." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (internal quotation marks omitted); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met.").

## B.    Implicit Requirement of Ascertainability

As noted above, because Russell attempts to certify the class under Rule 23(b)(3), he must satisfy the implicit requirement that the class is ascertainable. Concluding that membership in the class would require this Court to resolve the

merits of each class member's claims, Russell has not met the requirement that the class be ascertainable.

"The requirement of ascertainability, though not expressly mentioned in Rule 23, is fundamental." *Hnot v. Willis Grp. Holdings Ltd.*, 228 F.R.D. 476, 481 (S.D.N.Y. 2005). Class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries. *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 HB, 2003 WL 21659373, at *2 (S.D.N.Y. July 15, 2003); *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001). "While class members need not be ascertained prior to certification, they must be ascertainable at some stage of the proceeding." *Bakalar*, 237 F.R.D. at 64.

Here, the class is not ascertainable because the Court would be required to engage in numerous distinct fact-intensive inquiries to determine class membership. In his renewed motion, Russell asserts that the proposed class consists of inmates who "consider the content of [the prepackaged kosher] meals to be in conflict with their sincerely held religious dietary beliefs." (Doc. 141 at 2.) Accordingly, in order to determine class membership, the Court would be forced to inquire into each prisoner's subjective beliefs and determine whether the individual prisoner "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590 (internal quotation marks omitted). The Court would then be required to determine whether the DOC policy substantially burdened that prisoner's specific beliefs. *Id.* In cases such as this, where the Court would be required to hold a "mini-hearing on the merits of each case," courts have

74

routinely concluded that a class is not ascertainable.  *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618(KMW)(HBP), 2004 WL 5719589, at *5 (S.D.N.Y. Mar. 31, 2004) ("The principal vice with the proposed definition is that it links class membership with the merits of the class members' claims."); *see also Bakalar*, 237 F.R.D. at 65 (declining plaintiff's "invitation to embark on an odyssey that would require innumerable fact intensive inquiries to ascertain class membership"); *Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 402 (W.D.N.Y. 2013) ("Such a broad definition cannot create an ascertainable class, because it would require inquiry into the merits of each potential class member's claim.")  Given that Russell's proposed class definition "links class membership with the merits of the class members' claims" and would require individual inquiries into each prisoner's religious beliefs, the class cannot be ascertained by the Court.  *Kiobel*, 2004 WL 5719589, at *5.

### C.    Explicit Requirements Under Rule 23(a)

#### 1.    Numerosity

Nor does Russell submit the significant proof necessary to meet the numerosity requirement.

To be certified, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This does not involve a rigid number, but "in determining whether a class is so numerous that joinder of all class members is impracticable, joinder is 'generally presumed to be impracticable when a putative class exceeds 40 members.'"  *Allen*, 279 F.R.D. at 263 (quoting *Menkes v. Stolt–Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010)).  In assessing numerosity, a court

may make "common sense assumptions," and a plaintiff need not provide a "precise quantification of their class." *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 70 (E.D.N.Y. 2000) (internal quotation marks omitted). "Nevertheless, bare assertions of numerosity are insufficient, and a plaintiff seeking class certification must reasonably estimate or provide some evidence of the number of class members to support the conclusion that the class is too numerous to make joinder practicable." *Reese v. Arrow Fin. Servs., LLC*, 202 F.R.D. 83, 90 (D. Conn. 2001).

Here, in his renewed motion, Russell asserts that the proposed class consists of over 100 inmates currently housed by the DOC, as well as those inmates that were previously housed by the DOC, who consider the content of the prepackaged kosher meals to conflict with their sincerely held religious beliefs. (Doc. 141 at 2.) As support for this assertion, Russell points to Arnell's deposition, in which Arnell estimated that over 100 inmates received halal meals prior to the implementation of the current prepackaged religious food policy. (Doc. 141-2 at 3, p. 27; Doc. 141 at 2.) According to Russell, "given that only a small percentage of Muslim inmates have accepted the prepackaged kosher meals, it seems likely that the large majority take the same position as Mr. Russell, holding that these meals are not halal." (Doc. 141 at 2.) But this assertion amounts to baseless speculation, as Russell has offered no proof, let alone "significant proof," that any of the inmates described actually hold similar religious beliefs as Russell. *See Davidson v. Yeshiva Univ.*, 555 F. Supp. 75, 77 (S.D.N.Y. 1982) (concluding numerosity was not satisfied where "no other person with a similar claim has been identified"); *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D.

291, 295 (D. Conn. 2001) ("While the requirements for class certification are to be applied liberally, an individual civil rights case cannot be transformed into a class action simply by virtue of the *ipse dixit* that since it happened to the plaintiff, it must have happened to others, without some indication allowing the Court to make the 'reasonable estimate' that the law requires.").  Absent such an evidentiary basis, the Court cannot estimate how many inmates hold similar beliefs, nor can the Court determine whether the class is too numerous to make joinder practicable.[27]  *See Pecere*, 194 F.R.D. at 70 (determining that numerosity was not established where plaintiff "failed to proffer any evidence to permit a reasonable estimate of the number of persons who fit within the proposed class" and only alleged that "it is likely that the class exceeds several hundred persons" (internal quotation marks omitted)).  Accordingly, the numerosity requirement has not been satisfied.

### 2.    Commonality and Typicality

Similar evidentiary problems prevent Russell from satisfying Rule 23(a)(2) and Rule 23(a)(3), which require commonality and typicality between the class members' grievances.

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)."

---

[27]  Russell also suggests that the Court certify the class provisionally and require additional discovery as to numerosity, "to identify and contact all Muslim inmates who were/are within the custody of DOC from December 2014 to the present, to ascertain whether they satisfy these criteria." (Doc. 141 at 2–3.)  This suggestion, however, misconceives the nature of the burden on a plaintiff moving for class certification: Russell must show that the requirements of Rule 23 have been met before the class can be certified.  *See* Fed. R. Civ. P. 23(a); *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997) ("Before certifying a class, a district court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.")

*Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* (alteration in original) (quoting *Falcon*, 457 U.S. at 157 n.13)). "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Id.* "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores*, 564 U.S. at 349–50 (internal quotation marks omitted). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. Instead, "[t]heir claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Typicality, by contrast, requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A.*, 126 F.3d 372, 376 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

In the Second Amended Complaint, Russell asserts that "[t]he question of whether the diet provided to Muslim prisoners by Mr. Pallito and Ms. Menard satisfies their obligation to provide a diet in accordance with prisoners' religious

78

beliefs is a question of fact common to the class." (Doc. 61 at 4, ¶18.) Further, Russell contends that his claims are typical of other putative members of the class because "his claims do not differ in any material way from the claims being raised on behalf of the class." (Doc. 41 at 6.) But these claims merely restate the general standards applicable to Rule 23(a)(2) and (a)(3) and "[m]ere paraphrasing . . . by conclusory allegations of commonality is insufficient." *Davidson*, 555 F. Supp. at 78.

Put another way, Russell does not provide "significant proof" that he has questions of law or fact in common with any other potential plaintiff. Instead, Russell's argument rests on the DOC prepackaged religious food policy, which he argues "was a single policy decision that affected all of the proposed class members." (Doc. 41.) But nothing in the record establishes that the policy affected the class members in the same manner because Russell has not submitted sufficient evidence to establish a class of prisoners who hold beliefs similar to his own. Instead, as the deposition of Dr. Fuerst acknowledges, the precise halal requirements are the subject of an ongoing and evolving debate within Muslim communities. (*See* Doc. 134-3 at 9, p. 72; *id.* at 22, p. 156.) Accordingly, rather than providing convincing proof, the evidence suggests the opposite: that whether or not the prepackaged food policy violated the proposed class members' religious rights depends on each member's personal beliefs and is not a common contention capable of class-wide resolution. *See Wal-Mart Stores*, 564 U.S. at 349–50 (stating that commonality does not mean the mere violation of the same provision of law); *see also Mathis v. Bess*, 692 F. Supp. 248, 255 (S.D.N.Y. 1988) (concluding commonality was not satisfied

where plaintiff's due process and equal protection claims required resolution on a case-by-case basis).

For similar reasons, Russell fails to meet the typicality requirement because, absent evidence that the proposed class members follow Russell's specific halal requirements, nothing in the record shows that the prepackaged religious food policy typically resulted in a violation of the putative class member's rights. *See Rivera v. Marcus*, 533 F. Supp. 203, 209 (D. Conn. 1982) (concluding typicality was not met where plaintiff's claims rested on a narrow interpretation of plaintiff's due process rights); *Rambarran v. Dynamic Airways, LLC*, No. 14-CV-10138 (KBF), 2015 WL 4523222, at *8 (S.D.N.Y. July 27, 2015) ("[T]here is no evidence that the named plaintiffs' experience in this regard is typical of the experiences of other putative class members."); *Gonzalez v. City of Waterbury*, Civil Action No. 3:06 CV 89(CFD), 2008 WL 747666, at *2 (D. Conn. Mar. 18, 2008) (concluding typicality was not met where facts could be different for proposed class members and could affect the defendants' culpability). In short, because different facts regarding each class member's specific religious beliefs could affect Menard and Pallito's liability, the typicality requirement has not been met.

In sum, to meet the requirements for class certification Russell must offer significant proof to establish commonality and typicality by a preponderance of the evidence. He has not satisfied this evidentiary burden.

### 3.    Adequacy

On the other hand, Russell has offered sufficient evidence to conclude that he would "fairly and adequately protect the interest of the class." Fed. R. Civ. P.

80

23(a)(4).  "To determine whether the requirement of adequacy has been satisfied, courts must look to whether 'the representative parties will fairly and adequately protect the interests of the class.'"  *Ingles v. City of New York*, No. 01 Civ. 8279(DC), 2003 WL 402565 at *5 (S.D.N.Y. Feb. 20, 2003) (quoting Fed. R. Civ. P. 23(a)(4)). "Adequate representation is a twofold requirement: class counsel must be qualified and able to conduct the proposed litigation, and the class representatives must not have interests antagonistic to those of the other class members."  *Kiobel*, 2004 WL 5719589, at *8 (quoting *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 127 (E.D.N.Y. 2003)).

Under the first prong, Russell's attorney has submitted an affidavit detailing his general legal experience.  (*See generally* Doc. 41-1.)  Although the affidavit does not describe specific experience conducting federal class actions, I conclude that the experience described in the affidavit is sufficient to find that Russell's counsel would adequately represent the interests of the proposed class.  Similarly, under the second adequacy prong, nothing in the record suggests a conflict between Russell, as the named representative, and the putative class members.  *See Kiobel*, 2004 WL 5719589, at *8.  Nor do Menard and Pallito seriously contest the adequacy of Russell as class representative; instead, they question Russell's moral character and ability to fund the litigation.  (*See* Doc. 46 at 11–12.)  Neither of these contentions are evidence of a conflict.  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Courts do not require the representative plaintiff to be the best of all possible plaintiffs or to be especially knowledgeable, intelligent, or possessing a

81

detailed understanding of the legal or factual basis on which a class action can be maintained.")

### D.    Rule 23(b)(3) Requirements

In the event Russell again seeks to refile his motion for class certification at a later date and to facilitate review, I elect to address the requirements of Rule 23(b). Even if threshold requirements of Rule 23(a) were satisfied, Russell could not maintain the class under Rule 23(b)(3) because common questions of the class members do not predominate.

As noted above, Russell focuses his arguments for class maintenance on the factors set forth in Rule 23(b)(3).  (*See* Doc. 41 at 6–9.)  Accordingly, because Russell bears the burden of maintaining a class action, it is assumed that Rule 23(b)(3) applies.[28]  That subsection requires that a plaintiff seeking to represent a class establish  "(1) predominance—'that the questions of law or fact common to class

---

[28]  Even if Russell had sought to certify the class under Rule 23(b)(2), the Court concludes that Russell's proposed class could not be maintained.  Rule 23(b)(2) permits a court to certify a case for class-action treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief *is appropriate respecting the class as a whole*."  Fed. R. Civ. P. 23(b)(2) (emphasis added).  "The final clause is important [because] 'claims for individualized relief . . . do not satisfy [Rule 23(b)(2)].'"  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012) (all but first alteration in original) (emphasis and citation omitted) (quoting *Wal-Mart Stores*, 564 U.S. at 360).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart Stores*, 564 U.S. at 360.  In this case, it is not clear that enjoining the prepackaged religious food policy would provide relief to all members of the putative class because no proof demonstrates that the proposed class members have adopted the same halal requirements as Russell.  Moreover, in order to make that determination, the Court would be required to individually assess the religious beliefs of each proposed class member.  As a result, the class has not been adequately defined under Rule 23(b)(2).  *See Jamie S.*, 668 F.3d at 499 (stating that Rule 23(b)(2) is not satisfied "if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final."); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 481 (8th Cir. 2016) ("The resolution of that single question does not apply uniformly to the entire class, as in reality, the issue of liability and the relief sought . . . is, at bottom, highly individualized.").

members predominate over any questions affecting only individual members'; and (2) superiority—'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Nextel Commc'ns Inc.*, 780 F.3d at 137 (quoting Fed. R. Civ. P. 23(b)(3)).  As discussed below, Russell has not met his burden of establishing these elements by a preponderance of the evidence.

### 1.    Predominance

Rule 23(b)(3)'s predominance requirement is "more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *accord Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997) ("Even if Rule 23(a)'s commonality requirement may be satisfied . . . , the predominance criterion is far more demanding.").  "[A] court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Nextel Commc'ns Inc.*, 780 F.3d at 138 (internal quotation marks omitted).  "Predominance requires a further inquiry, however, into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Id.*

Here, as discussed in detail above, Russell has not offered generalized evidence to prove that the DOC policy violated the putative class's right to freely exercise their religion.  Nor could generalized evidence be offered to prove the elements of a free exercise claim on a class-wide basis.  As set forth above, a prisoner bringing a free exercise claim must establish (1) that he or she has a

sincerely held religious belief, and (2) that this religious belief was substantially burdened. *Salahuddin*, 467 F.3d at 274. Accordingly, in order to establish each class member's entitlement to relief, the Court would be forced to inquire into each prisoner's subjective beliefs and determine whether that prisoner sincerely held a belief in the strict halal requirements espoused by Russell. *Ford*, 352 F.3d at 590. Next, to determine if that prisoner's belief was "substantially burdened," the Court would be required to ascertain whether the specific religious diet was of central importance to that *prisoner's* practice of the religion. *Id.* Both of these steps would require individualized proof as to each class member, necessitating a multitude of mini-trials. Accordingly, Rule 23(b)(3)'s predominance requirement has not been met. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (concluding Rule 23(b)(3)'s requirements are not met where "certification of the class will not negate the need for a series of mini-trials"); *Lewis Tree Serv., Inc. v. Lucent Tech. Inc.*, 211 F.R.D. 228, 235 (S.D.N.Y. 2002) (determining "factual issues common to the class cannot predominate" where "[a]ny trial would invariably result in mini-trials").

### 2.    Superiority

Similarly, I conclude that a class action is not superior to other methods of resolving the controversy.

Rule 23(b)(3) also requires a class action be "superior to other available methods to fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In analyzing that question, courts must consider four nonexclusive factors: (1) the interest of the class members in maintaining separate actions; (2) "the extent

and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

A class action is not a superior method of adjudication under these circumstances. First, although the damages suffered by the proposed class members appear to be relatively small, the expense and burden of individual litigation is militated by 42 U.S.C. § 1988(b), which permits the prevailing party in an action under 42 U.S.C. § 1983 to be awarded attorney's fees. *Cf. Martinez v. Ayken, Inc.*, CV 13-7411 (LDW) (AKT), 2016 WL 5107143, at *13 (E.D.N.Y. Feb. 29, 2016) (finding class action superior where "damages suffered are small in relation to the expense and burden of individual litigation" (internal quotation marks omitted)). More importantly, as discussed in detail above, the individual nature of each proposed class member's free exercise claim suggests that a class action will not facilitate efficient adjudication. In particular, Menard and Pallito's personal liability for damages cannot be resolved quickly and conclusively because each member's free exercise claim must be assessed on an individual basis. *Cf. In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (concluding class action superior where "individual[] inquiries will be few and far between). Finally, the "mini-trials" necessary to resolve these issues will increase the difficulty of managing the class action. Accordingly, a class action is not the most fair and efficient vehicle.

## VI.    Russell's Motion to Reconsider

Finally, I turn to Russell's Motion to Reconsider, in which he seeks to renew his claims for injunctive and declaratory relief, as well as his allegations under RLUIPA, 42 U.S.C. § 2000cc-1.  (Doc. 140.)  As summarized above, the Court dismissed Russell's allegations seeking equitable relief along with his RLUIPA claim because, at the time, Russell was no longer in the custody of the DOC. (Doc. 69 at 19.)  As of June 24, 2018, Russell has been rearrested on pending criminal charges and he is currently being held without bail.  (Doc. 140-1.)  Given that the DOC's prepackaged religious food policy remains in place, Russell contends that he now has standing to seek equitable relief and to pursue his claims under RLUIPA.  (Doc. 140 at 1.)  Construing Russell's Motion to Reconsider[29] as a motion to supplement the pleadings, the Court concludes that the motion should be GRANTED and Russell given leave to file a supplemental pleading setting forth his claims for injunctive relief and his allegations pursuant to RLUIPA.

Federal Rule of Civil Procedure 15(d) states in relevant part that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any

---

[29]    Even if the Court analyzed Russell's motion under the standards applicable to a motion to reconsider, *see* Fed. R. Civ. P. 54(b), the Court would be inclined to grant the motion because, as discussed in detail below, Menard and Pallito would suffer little prejudice if the motion to reconsider were granted.  Specifically, Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims  . . . does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  This permissive language is limited only by the law of the case, which requires a court to consider whether the party opposing the motion to reconsider would be prejudiced by granting the motion.  *Colvin v. Keen*, 900 F.3d 63, 68–69 (2d Cir. 2018) ("When deciding whether to change a ruling, you should consider whether making the change will cause problems that would make it preferable to adhere to the earlier ruling (even though you now consider it erroneous) or would at least make it advisable to take precautious measures to mitigate the bad effects of those problems." (internal quotation marks omitted)).

transaction, occurrence, or event that happened after the date of the pleading to be supplemented." "As a general matter, Rule 15(d) reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties." *Cummings-Fowler v. Suffolk Cty. Cmty. Coll.*, 282 F.R.D. 292, 296 (E.D.N.Y. 2012) (internal quotation marks omitted). "The same standard . . . applies to both motions to amend and motions to supplement." *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 222 (E.D.N.Y. 2010). That is, supplemental pleadings "should be denied only for reasons such as undue delay, bad faith, futility of the amendment or prejudice to the other party." *Id.*; *see also Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991) ("[U]nder Rule 15(d), a party may supplement the original pleading to include subsequent occurrences which are related to the claim presented in the original complaint, absent prejudice to the nonmoving party.") "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Cummings-Fowler*, 282 F.R.D. at 296. Ultimately, the decision to grant leave to supplement the pleadings lies within the sound discretion of the court. *Id.*

Here, Russell alleges that he has regained his standing because the prepackaged religious food policy remains in place, but his rearrest and the relevant factual circumstances supporting this argument postdate the allegations in his Second Amended Complaint. Accordingly, his motion is more properly considered a motion to supplement the pleadings. *See M.V.B. Collision,* 728 F. Supp. 2d at 222 (concluding that, because new allegations occurred after the filing of the initial complaint, the motion should be treated as a motion to supplement pleadings);

*Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008) (granting plaintiff leave to supplement the complaint *sua sponte*).  Further, Pallito and Menard have not demonstrated that they would be prejudiced by this amendment.  *Cummings-Fowler*, 282 F.R.D. at 296.  To the extent that Menard and Pallito "complain[] about added time and cost, '[a]llegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.'"  *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 153 (S.D.N.Y. 2012) (alteration in original) (quoting *Bridgeport Music, Inc. v. Universal Music Grp. Inc.*, 248 F.R.D. 408, 415 (S.D.N.Y. 2008) (permitting joinder of additional party where "the claims against [it were] virtually identical to those against the other defendants")).  Moreover, it is unlikely that Menard and Pallito will "have to expend significant additional resources because the same claims in the original complaint" are being alleged again "and further (limited) discovery itself is not an adequate ground to deny an amendment to a complaint."  *Salomon v. Adderley Indus., Inc.*, 960 F. Supp. 2d 502, 508 (S.D.N.Y. 2013); *see also United States v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.")  Similarly, permitting Russell to supplement his pleading under these circumstances would promote judicial economy by allowing the Court to resolve the entire controversy between the parties.  *Cummings-Fowler*, 282 F.R.D. at 296.  Finally, Menard and Pallito do not argue that such a supplemental pleading would be futile.  And indeed, the supplemental pleading would not be futile because this Court has previously determined that Russell's

claims for equitable relief and his RLUIPA claim survived Menard and Pallito's motion to dismiss. (Doc. 63 at 3); *Cummings-Fowler*, 282 F.R.D. at 298 ("A proposed amendment is futile if the proposed claim could not withstand a Fed. R. Civ. P. 12(b)(6) motion to dismiss.")

For the reasons set forth above, I conclude that Russell's motion should be construed as a motion to supplement the pleadings and Russell should be given leave to file a supplemental complaint with respect to his claims for injunctive relief and his RLUIPA allegations. *Wingate v. Gives*, No. 05 Civ.1872(LAK), 2008 WL 5649089, at *2 (S.D.N.Y. Apr. 13, 2008) (denying plaintiff's motion for an injunction and declaratory relief without prejudice and granting leave, "pursuant to Fed. R. Civ. P. 15(d), . . . to file a supplemental complaint with respect to the claim that he currently is, and since his return to . . . custody has been, denied a proper diet").

## Conclusion

For the reasons set forth above, I recommend that Menard and Pallito's Motion for Summary Judgment be DENIED (Doc. 123), that Russell's Motion for Partial Summary Judgment be DENIED (Doc. 121), that Mason and Bilodeau's Motion for Summary Judgment be GRANTED (Doc. 128), that Russell's Renewed Motion to Certify Class and Motion to Reopen Discovery be DENIED (Doc. 141), and that Russell's Motion for Reconsideration be GRANTED. (Doc. 140.)

Dated at Burlington, in the District of Vermont, this 7th day of January 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).